PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-4092
_____

UNITED STATES OF AMERICA

v.

NEAL D. SAFERSTEIN,
                              Appellant

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Crim. No. 2:07-00557)
District Judge: Honorable Cynthia M. Rufe
_____

Submitted Under Third Circuit LAR 34.1(a)
January 24, 2012
_____

Before: FISHER, GREENAWAY, JR., *Circuit Judges*, and
JONES[*], *District Judge.*

_____

[*] The Honorable John E. Jones, III, United States District
Court for the Middle District of Pennsylvania, sitting by
designation.

(Opinion Filed: January 26, 2012)

Peter Goldberger, Esq.
50 Rittenhouse Place
Ardmore, PA 19003-2276

Stephen R. LaCheen, Esq.
LaCheen Wittels & Greenberg
1429 Walnut Street
Suite 1301
Philadelphia, PA 19102-0000
        *Counsel for Appellant*


Jason Bologna, Esq.
Jennifer A. Williams, Esq.
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106
        *Counsel for Appellee*

_____

OPINION
_____


GREENAWAY, JR., *Circuit Judge*.

Neal Saferstein ("Saferstein") pled guilty in the United States District Court for the Eastern District of Pennsylvania to four federal criminal charges related to a

fraudulent business scheme in which he had engaged. In the plea agreement, Saferstein waived his appellate rights subject to several exceptions, including an exception for "the assertion of constitutional claims that the relevant case law holds cannot be waived." (App. 90.) Following his sentence, Saferstein now argues on appeal that the District Court (1) violated his due process rights by denying him credit he believes he was due under the United States Sentencing Guidelines (the "Guidelines") for acceptance of responsibility; (2) denied him his right of allocution at sentencing; and (3) violated his rights under the ex post facto clause. He contends that his appellate waiver does not foreclose any of these arguments.

We hold, as a result of a statement by the District Court during the plea colloquy, which improvidently expanded Saferstein's appellate rights, that Saferstein did not waive his right to raise constitutional claims on appeal. We further find that his ex post facto claim is of constitutional moment and meritorious. We will vacate and remand to the District Court for resentencing.

## I. BACKGROUND

From 1997 until 2004, Saferstein was President, Chief Executive Officer, and majority owner of GoInternet, a telemarketing company based in Philadelphia. Beginning in 1997, GoInternet's telemarketers cold-called businesses around the country in an attempt to sell them an internet services package, including a web page, dial-up web access, and an email account. GoInternet began charging each business that agreed to receive a "welcome packet" $29.95 per month for these services, a fee which was added to its telephone bill. By the end of 2003, more than 350,000

3

businesses were "customers" of GoInternet, yielding annual gross revenue in excess of $49 million.

GoInternet's implementation of this business model had several fraudulent aspects. First, the telemarketers frequently failed to disclose the full terms of the agreement, including the fact that consenting to receive a welcome packet would result in the $29.95 monthly charge unless the business called GoInternet within fifteen days to cancel services. Second, the welcome packet looked like unsolicited junk mail, so that it was often discarded unopened. Even if a customer did open and read the welcome packet, disclosures related to billing were hidden, so that most customers remained unaware that they were required to cancel services in order to avoid being charged. Third, because the charges appeared only within telephone bills, many customers did not notice the GoInternet charges. Fourth, GoInternet lacked the personnel to handle incoming calls from customers, making it extremely difficult for customers who attempted to cancel to do so successfully.

In addition to these fraudulent practices, the web pages provided to GoInternet customers were not accurate or useful to potential customers. The websites were generic, filled with mistakes, and often appeared at web addresses that were impossible to locate using major search engines.

The Government has estimated the losses to customers associated with the scheme to be approximately $74 million.

In 2000, the Federal Trade Commission ("FTC") brought suit against Saferstein and GoInternet. *Federal Trade Commission v. Mercury Marketing of Delaware, Inc., and Neal D. Saferstein*, No. 00-CV-3281 (E.D. Pa. filed June

4

29, 2000). On March 1, 2001, the parties agreed to a stipulated judgment and order for permanent injunction, which contained various prohibitions to protect customers from unauthorized billing and directed GoInternet to send postcards to all of its customers informing them that they were being billed and were paying for GoInternet services. Despite the agreement, Saferstein directed that those postcards be altered or destroyed.

As a result of this and other noncompliant conduct, the FTC sought to hold Saferstein and GoInternet in contempt. In anticipation of a hearing on that matter before the District Court, Saferstein directed GoInternet executive, and eventual co-defendant, Billy D. Light to testify falsely that 55,000 GoInternet customers used their email accounts and 33,000 used their dial-up internet service each week. Throughout his time as CEO of GoInternet, Saferstein earned approximately $20,000 each month in commissions, in addition to an annual base salary. He also paid for significant personal expenses with corporate funds. His tax returns, however, reported only his annual base salary.

The criminal indictment in this case charged Saferstein with failing to report more than $1.8 million in income. Saferstein additionally failed to pay more than $2.8 million in payroll taxes that had been withheld from GoInternet employees' paychecks.

The indictment charged Saferstein with (1) sixteen counts of mail and wire fraud; (2) one count of conspiracy to commit perjury; (3) four counts of submitting false tax returns; and (4) six counts of failure to pay over payroll taxes. Just before trial, Saferstein pled guilty to Count 1, mail fraud;

Count 16, wire fraud; and Counts 20 and 21, submitting false tax returns.

The plea agreement contained language stipulating that, "as of the date of this agreement, the defendant has demonstrated acceptance of responsibility for his offense" and is therefore "eligible for a 2-level downward adjustment" pursuant to the Guidelines. (App. 86.) It also contained an appellate waiver provision, which provided that Saferstein "voluntarily and expressly waive[d] all rights to appeal or collaterally attack" his conviction, subject to several exceptions. (*Id.* at 90.) The waiver was "not intended to bar the assertion of constitutional claims that the relevant case law holds cannot be waived." (*Id.*) Further, it provided an exception if the government were to appeal Saferstein's sentence and excepted a small number of enumerated claims that Saferstein would be permitted to raise on appeal: (1) that his sentence exceeded the statutory maximum for that count; (2) that the sentencing judge erroneously departed upward under the Guidelines; or (3) that the sentencing judge imposed an unreasonable sentence above the Guideline range.

During the plea colloquy, the District Court discussed the waiver in detail with Saferstein. It explained the appellate rights that Saferstein would have absent the waiver and precisely what rights remained. Regarding the provision concerning constitutional claims, the court stated that the waiver "of course, is not intended to bar you [from] raising constitutional claims, and only the Court can decide whether they are constitutional claims or some other kind of claim." (*Id.* at 161.) When asked whether he understood, Saferstein responded in the affirmative.

6

After the sentencing hearing, the District Court ultimately agreed with the Pre-Sentence Investigation Report ("PSR") that Saferstein qualified for a criminal history category of I and an offense level of 43, largely as a result of the enormous amount of money that the fraud involved. Based on this Guidelines calculation, Saferstein was eligible for the statutory maximum sentence, forty-six years on the four counts.

The District Court denied Saferstein credit for acceptance of responsibility. It based this determination on several factors. First, the Court noted that after pleading guilty, Saferstein had failed to expeditiously turn over certain financial and medical reports to the probation office. Second, it determined that a number of his statements during the sentencing hearing "backtrack[ed] on the enormity of his own involvement in the scheme that he is responsible for contriving." (*Id.* at 298.)

The court, after granting a significant downward variance, sentenced Saferstein to twenty-three years of imprisonment, composed of concurrent twenty-year sentences on each of the wire and mail fraud counts, followed by concurrent three-year sentences on the two counts charging submitting false tax returns. He also received three years of supervised release and a fine of $100,000. Saferstein timely appealed.

## II. **JURISDICTION AND STANDARD OF REVIEW**

The District Court had jurisdiction over this case pursuant to 18 U.S.C. § 3231. This Court has jurisdiction over a challenge to the sentence under 18 U.S.C. §§ 1291 and 3742(a). "[O]ur review of the validity and scope of appellate

waivers is plenary." *United States v. Corso*, 549 F.3d 921, 926 (3d Cir. 2008) (citations omitted).

We review for plain error Saferstein's claim that he was sentenced in violation of the ex post facto clause, which he did not raise in the District Court. Fed. R. Crim. P. 52(b); *United States v. Syme*, 276 F.3d 131, 158 (3d Cir. 2002). "A defendant must satisfy a four-prong test to be successful under plain error review: there must be (1) an error; (2) that is plain; (3) which affects substantial rights; and (4) seriously impairs the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cesare*, 581 F.3d 206, 209 (3d Cir. 2009) (citations omitted).

## III. <u>ANALYSIS</u>

### A. <u>Appellate Waiver</u>

When "the government invokes an appellate-waiver provision contained in a defendant's plea agreement, we must determine as a threshold matter whether the appellate waiver prevents us from exercising our jurisdiction to review the merits of the defendant's appeal." *Corso*, 549 F.3d at 926 (citations omitted). We decline to exercise jurisdiction over the appeal where the issues on appeal fall within the scope of the waiver and the defendant knowingly and voluntarily agreed to the waiver, unless "enforcing the waiver would work a miscarriage of justice." *Id.* at 927 (citations omitted).

Here, Saferstein argues that he did not waive his right to this appeal because each of the issues he presents represent constitutional claims and the District Court, during the plea colloquy, stated that the appellate waiver "of course, is not intended to bar you [from] raising constitutional claims, and

8

only the Court can decide whether they are constitutional claims or some other kind of claim." (App. 161.) As a result, Saferstein argues that the agreement he entered into voluntarily and knowingly preserves his right to appeal constitutional claims.

The Government contends that this statement is not controlling, since it misrepresents the plain language of the plea agreement, which states that the waiver was "not intended to bar the assertion of constitutional claims that the relevant case law holds cannot be waived." (*Id.* at 90.) The District Court's statement is clearly at odds with the otherwise plain and straightforward language of the agreement. That statement thus created a plausible and tangible ambiguity and seemingly expanded Saferstein's appellate rights. [1]

We have not spoken before on the impact of a sentencing court's oral statement during a plea colloquy on the interpretation of a plea agreement. It is clear that

---

[1] "[L]ogic indicates that if we may rely on the sentencing court's statements to eliminate ambiguity prior to accepting a waiver of appellate rights, we must also be prepared to recognize the power of such statements to achieve the opposite effect. If it is reasonable to rely upon the court's words for clarification, then we cannot expect a defendant to distinguish and disregard those statements of the court that deviate from the language of a particular provision in a lengthy plea agreement." *United States v. Wilken*, 498 F.3d 1160, 1168 (10th Cir. 2007).

9

principles of contract law apply to plea agreements. *United States v. Williams*, 510 F.3d 416, 422 (3d Cir. 2007). Generally speaking, because the government exercises tremendous bargaining power during the process of plea negotiation, we construe any ambiguities in the text against the government as drafter, *id.* at 422, but the plain text at issue here is not ambiguous. It clearly refers to a specific subset of constitutional claims,[2] not to the entire category of constitutional claims, as the District Court's statement during the colloquy indicated.

The parol evidence rule generally mandates that when a "written contract is clear and unequivocal, its meaning must be determined by its contents alone." *Amer. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 594 (3d Cir. 2009). However, the plea colloquy has no analogue in contract law; indeed, regardless of the clarity of a written plea agreement, Rule 11(b) of the Federal Rules of Criminal Procedure obligates a district court, before accepting a plea of guilty, to place the defendant under oath and to address the defendant orally and in open court, informing him of, *inter alia*, "the terms of any plea-agreement provision waiving the right to appeal or to collaterally attack the sentence." Fed. R. Crim. P. 11(b)(1)(N). The court must also determine that the defendant understands those terms. *Id.*

---

[2] Although the parties engage in substantial debate as to whether the category of non-waiveable constitutional claims is an empty category, this is not a question we need to resolve here. The language of the agreement is not ambiguous regardless of the answer.

We have recognized that a plea colloquy that fails to meet the requirements of Rule 11(b)(1)(N) can prevent a defendant from knowingly and voluntarily waiving his appellate rights. *Corso*, 549 F.3d at 928-930; *see also United States v. Goodson*, 544 F.3d 529, 540-41 (3d Cir. 2008). Given that precedent, and our recognition that plea agreements must be construed to protect the defendant as the weaker bargaining party, *see Williams*, 510 F.3d at 422, we must find that a statement made by the sentencing court during the colloquy can create ambiguity where none exists in the plain text of the plea agreement. *See United States v. Wilken*, 498 F.3d 1160, 1168 (10th Cir. 2007) ("[W]e cannot expect a defendant to distinguish and disregard those statements of the court that deviate from the language of a particular provision in a lengthy plea agreement-especially where, as here, neither the government nor defense counsel apparently noticed the error at the time."). We construe this ambiguity against the government and interpret the waiver narrowly. Therefore, we shall allow Saferstein to raise constitutional claims on appeal, as the District Court represented during the colloquy that he would be able to do.[3]

---

[3] Saferstein's argument that the District Court erred by denying him credit for acceptance of responsibility is not constitutional in nature. The only support Saferstein musters for his contention that this error implicates his due process rights, *United States v. Furst*, 918 F.2d 400, 408 (3d Cir. 1990), and its progeny, in fact notes constitutional dimensions to sentencing based on materially false information. Saferstein's allegation that the sentencing court erroneously interpreted the Guidelines is distinct and does not implicate his due process rights.

B.  Ex Post Facto Claim

The only issue Saferstein raises which is of constitutional moment is his ex post facto claim.  Saferstein argues that his sentencing, which occurred in accordance with the 2009 Guidelines Manual, violated the ex post facto clause.  *See* art. I, § 9, cl. 3.  The mail and wire fraud counts of which he was convicted occurred in December 2002 and June 2003, and the base offense level for fraud under the Guidelines was

---

 Saferstein also argues that the District Court infringed upon his right of allocution by allowing the Government to cross-examine him before sentencing.  "[T]he right of allocution is not constitutional."  *United States v. Adams*, 252 F.3d 276, 288 (3d Cir. 2001).  Although Saferstein asserts that our later opinion in *United States v. Fisher*, 502 F.3d 293 (3d Cir. 2007), undermines the clear pronouncement in *Adams*, *Adams* still controls.  Our precedent makes clear that "to the extent that [an opinion of a panel of this Circuit] is read to be inconsistent with earlier case law, the earlier case law . . . controls."  *Holland v. N.J. Dep't of Corr.*, 246 F.3d 267, 278 n.8 (3d Cir. 2001) (citing *O. Hommel Co. v. Ferro Corp.*, 659 F.2d 340, 354 (3d Cir. 1981)).

Accordingly, neither of these claims falls under the constitutional exception to Saferstein's appellate waiver, and we shall not consider them on the merits.

subsequently increased on November 1, 2003. U.S.S.G. appx. C, amend. 653. Both counts for submitting false tax returns of which Saferstein was convicted occurred after that date.

The Guidelines direct a one-book rule, requiring that a "Guidelines Manual in effect on a particular date shall be applied in its entirety." U.S.S.G. § 1B1.11(b)(2). When a "defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses." § 1B1.11(b)(3). According to the background note in the Guidelines, "Because the defendant completed the second offense after the amendment to the guidelines took effect, the ex post facto clause does not prevent determining the sentence for that count based on the amended guidelines." *Id.* The background note also provides that this approach "should be followed regardless of whether the offenses of conviction are the type in which the conduct is grouped under § 3D1.2(d)," unless the ex post facto clause would be violated by that treatment. *Id.*

Nonetheless, commentary to the Guidelines does not bind federal courts where it violates the Constitution, *United States v. Bertoli*, 40 F.3d 1384, 1405 (3d Cir. 1994), and we have held that the ex post facto clause requires that a sentencing court apply the Guidelines Manual in effect at the time the offense was committed if retroactive application of the later Manual would result in harsher penalties. *United States v. Seligsohn*, 981 F.2d 1418, 1424 (3d Cir. 1992), *superseded by statute for other reasons as stated in United States v. Corrado*, 53 F.3d 620, 624 (3d Cir. 1995). Further, we have expressly disapproved the one-book rule where it

13

conflicts with the ex post facto clause by resulting in "more stringent penalties than were authorized at the time of the offense." *Id.*

Even "[t]he fact that various counts of an indictment are grouped cannot override *ex post facto* concerns," *Bertoli*, 40 F.3d at 1404 (citing *Seligsohn*, 981 F.2d at 1424), although our ex post facto concerns are assuaged when counts are properly grouped under § 3D1.2(d) as "continuing, related conduct" and the sentencing court applies the Guidelines Manual relevant to the latest count. *United States v. Siddons*, 660 F.3d 699, 707 (3d Cir. 2011). In such a case, "the grouping provisions, combined with the one-book rule, place a defendant on notice that a court will sentence him or her under the Guidelines Manual in effect during the commission of his or her last offense in a series of continuous, related offenses." *Id.*

Here, the sentencing court applied the Guidelines Manual in effect when the false tax returns were submitted to the IRS even though those counts were not grouped with the mail and wire fraud counts. Indeed, the PSR recognized that, pursuant to our decision in *United States v. Astorri*, 923 F.2d 1052 (3d Cir. 1991), tax fraud counts could not be grouped with fraud on private individuals. In this circumstance, the application of the later edition of the Guidelines Manual did violate the ex post facto clause.

Since the sentencing court made an error that is plain, Saferstein meets the first two prongs of the plain error test. *See Cesare*, 581 F.3d at 209. We have also held that when the application of the wrong Guidelines Manual, in violation of the ex post facto clause, results in the use of a higher sentencing range, there is a presumption that the defendant's

14

substantial rights are affected.  *See Syme*, 276 F.3d at 158. The government has failed to rebut this presumption of prejudice.  Finally, we have concluded in the past that such an error "too 'seriously affects the fairness, integrity, or public reputation of judicial proceedings' to be left uncorrected." *Id.* (quoting *Olano*, 507 U.S. 725 (1993)).

Accordingly, we vacate Saferstein's sentence and remand to the District Court with instructions to calculate his base offense level in accordance with the Guidelines Manual in effect when the mail and wire fraud counts were committed.

## IV.  <u>CONCLUSION</u>

For the reasons set forth above, we will vacate the sentence imposed by the District Court and remand for resentencing in accordance with the above opinion.