NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-2423
_____

UNITED STATES OF AMERICA

v.

MILTON R. NANCE,
                              Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 2-09-cr-00193-001)
District Judge:  Honorable Arthur J. Schwab
_____

Submitted Under Third Circuit LAR 34.1(a)
March 29, 2012

Before:  McKEE, *Chief Judge*, FUENTES, and JORDAN, *Circuit Judges*

(Filed: September 18, 2012)
_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Milton Nance pled guilty in the United States District Court for the Western

District of Pennsylvania to possession of counterfeit money, bank fraud, and aggravated

identity theft.  His plea agreement permitted him to appeal the portion of the District

Court's order denying his pre-trial motion to suppress, and Nance does challenge that

order.  As part of this direct appeal, he also challenges the Court's order denying his motion for the District Judge to be disqualified.  For the reasons that follow, we will decline to exercise our jurisdiction to review the merits of Nance's recusal claim, and will affirm the District Court's order denying the motion to suppress.

## I.    Background

On January 12, 2008, Nance was serving a parole sentence in a half-way house.  After receiving a pass that day to leave the facility, he left and did not return.  He began to live in motels, and supported himself by producing counterfeit payroll checks, purchasing a laptop computer, a printer/scanner/copier, and VersaCheck software to do so.  Less than a month later, he was arrested for attempting to cash a counterfeit payroll check, and was sent to state prison on March 10, 2008 for parole violations.[1]

On May 9, 2008, however, Nance was mistakenly released from prison, and resumed his fraudulent conduct.[2]  On August 19, 2008, he attempted to pass a counterfeit check at the AAA Motor Club in White Oak, Pennsylvania.  A clerk at AAA contacted

---

[1] These events were not Nance's first interaction with the criminal justice system. As the District Court noted, Nance "earned a Bachelor of Arts degree in Business Administration from the University of Pittsburgh and applied his education to a career of fraud and deceit."  (App. at 91.)  In 1990, he was convicted in federal court on two separate occasions for various fraud offenses.  Between 2006 and 2008, he was convicted of fraud related offenses in Pennsylvania state court on six different occasions.

[2] From June 8 through June 23, 2008, Nance opened various accounts at Citizens Bank using false information regarding his employment, address, and telephone numbers. He then deposited eight counterfeit payroll checks into those accounts, and then withdrew funds from those accounts causing losses to the bank totaling $4,799.91.  Additionally, sometime between August 16 and August 18, 2008, Nance deposited a counterfeit payroll check at National City Bank, but was unsuccessful in withdrawing funds from that account.

police, and officers from the White Oak Police Department arrested Nance on outstanding bench warrants for probation and parole violations. Incident to the arrest, the officers removed all possessions from Nance's pockets.

Because there was also an outstanding warrant for Nance's arrest from the Pennsylvania State Police, the White Oak Police Department transferred Nance to the custody of the State Police. When doing so, a member of the White Oak Police Department provided two state troopers, James McCutcheon and Teko Angelicchio, with an envelope containing Nance's possessions and told them that White Oak officers had not examined those items. After transporting Nance to a State Police station to be processed, Angelicchio began to search Nance's belongings and found counterfeit bills, as well as a credit card and receipts apparently belonging to an individual named Clayton Hoffer. Angelicchio also observed two cellular telephones, a computer thumb drive, and a wireless internet card. At that point, Angelicchio stopped looking through Nance's possessions and applied for a search warrant (the "First Search Warrant") to search through the remainder of those possessions. The probable cause affidavit supporting the First Search Warrant included all of the possessions that Angelicchio had observed, indicated that Nance was wanted for various forgery-related offenses, and requested "a search warrant to search [Nance's] personal possessions … to determine if there [was] any further contraband relating to the crimes of Forgery, Fraud or Theft." (App. at 214.)

A magistrate judge gave Angelicchio permission to execute the First Search Warrant, and, after undertaking that search, Angelicchio and McCutcheon found receipts for two computers and a laser jet printer among the seized possessions, which prompted

3

McCutcheon to apply for an additional search warrant (the "Second Search Warrant") to search a motel room where Nance had been staying in Irwin Township, Pennsylvania. The probable cause affidavit supporting the Second Search Warrant included all information from the probable cause affidavit supporting the First Search Warrant and added the following:

> On 08/19/08, a search warrant was obtained to search the personal possessions of Milton Randolph NANCE to determine if there was any further contraband relating to the crimes of Forgery, Fraud or Theft. As a result of the search warrant, receipts were observed with NANCE's possessions indicating that NANCE recently purchased a Compaq computer, a laser jet printer, and a Acer 3000 computer. … During the course of NANCE's arraignment before MDJ MAHADY, NANCE indicated that he was staying at the Motel 3, located in Irwin.

> I am requesting a search warrant to search the Motel 3 room #25, located at 7578 Route 30, Irwin, Hempfield Twp., Westmoreland County, which is currently rented to Milton R. NANCE to search for further contraband relating to the crimes of Forgery, Fraud or Theft.

(*Id.* at 223.) Approval for the Second Search Warrant was granted and, while executing that warrant in room 25 of the Motel 3, the troopers found a computer printer, a computer box, a copier, various suspected fraudulent checks, and different forms of fraudulent United States currency.[3]

On June 9, 2009, Nance was charged in the District Court with, among other things, uttering counterfeit obligations and securities, in violation of 18 U.S.C. § 472 ("Count One"), bank fraud, in violation of 18 U.S.C. § 1344(1) ("Count Eight"), and

---

[3] The troopers then applied for a third search warrant (the "Third Search Warrant") to search Nance's rented car, which was granted. When the troopers executed the Third Search Warrant, they identified additional contraband.

aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1) ("Count Twelve"). On March 16, 2010, he filed a motion to suppress the physical evidence that was seized pursuant to the Second Search Warrant.[4]

Before the District Court ruled on Nance's motion to suppress, on August 31, 2010, his counsel, the Office of the Federal Public Defender (the "OFPD"), moved to disqualify the District Judge from presiding over this case and 20 other pending cases based on comments made by the District Judge in two unrelated cases in which the OFPD served as defense counsel. The District Judge initially disqualified himself from Nance's case, but, on September 20, 2010, after the government filed a motion for reconsideration, the District Judge changed course and decided to continue to preside over Nance's case.[5]

On October 12, 2010, the OFPD filed a motion to stay the proceedings "pending resolution of a Petition for Writ of Mandamus by the Court of Appeals for the Third Circuit." (App. at 747.) The government responded by filing a motion to oppose the stay on October 18, 2010 and, in its response, indicated that Nance's claim "may be reviewed on direct appeal" and, "[a]ccordingly, mandamus [was] not the only adequate means for

---

[4] Nance also moved to suppress the physical evidence that was seized pursuant to the First Search Warrant and Third Search Warrant, and statements that he made to police officers. Because Nance does not argue those matters on appeal, we do not address them further.

[5] On July 31, 2012, after Nance appealed to us, the District Judge entered an order directing that, if we were to remand Nance's case for a new trial or re-sentencing, it should be assigned to another judge. Because we decline to exercise jurisdiction over Nance's recusal claim, *see infra* Part II.A, we need not decide what effect the July 31, 2012 order may have on the recusal challenge.

review of … Nance's disqualification motion." (*Id.* at 771.) The Court denied the motion to stay on October 21, 2010.

After granting the government's motion for reconsideration, but before denying the motion to stay, the District Court denied Nance's motion to suppress on October 18, 2010. With regard to the Second Search Warrant, the Court found that "[t]he circumstantial evidence cited in the affidavit[] provided a substantial basis for the issuing authority's decision that a sufficient nexus to issue [that] warrant[] existed between the crimes, items sought, [and] the motel room … ." (App. at 103.) Thus, "[t]he affidavit[] contained sufficient common facts to support the inference that Nance had been forging or making counterfeit money and that he was transient, and therefore the items sought might be found in his motel room … ." (*Id.*) The Court concluded that "[t]he determination of the magistrate that there was probable cause set forth in … the affidavit[] [was] fully supported by substantial evidence … ."[6] (App. at 104.)

On October 22, 2010, ten days before trial was scheduled to begin, and one day after the denial of the motion to stay, the District Court held a pre-trial conference. At that conference, the parties informed the Court that Nance was contemplating entering into a plea agreement, and they provided a copy of that agreement to the Court. The

---

[6] In the alternative, the Court concluded that "the record show[ed] that the troopers' reliance on the [Second Search Warrant] issued by the magistrate was reasonable and that the [Second Search Warrant] [was] executed in good faith reliance … [on the Warrant, as permitted by *United States v. Leon*, 468 U.S. 897 (1984)]." (App. at 104.)

Court ordered a brief recess so that defense counsel could discuss a few procedural matters with Nance before going through a plea colloquy.

After the recess, the pre-trial conference transitioned into a change of plea hearing, and Nance entered a plea of guilty to Count One, Count Eight, and Count Twelve. The plea agreement, dated October 18, 2010 and executed by Nance on October 22, 2010,[7] permitted Nance to file a direct appeal of "the Court's order denying Nance's suppression motions related only to the collection of physical evidence through an inventory search or search incident to arrest and through the execution of federal and state search warrants after Nance's arrest in August of 2008 by the Pennsylvania State Police." (Appellant's 2/23/12 Ltr., Exhibit 1, at 5.)[8] The plea agreement also provided that it did "not prevent the interlocutory separate filing before the United States Court of Appeals of a mandamus action to further attempt to have the … District Court Judge recused from this case." (*Id.*) On May 12, 2011, Nance was sentenced to 65 months' imprisonment and three years' supervised release.

This timely appeal followed.

---

[7] The first page of the plea agreement is dated October 15, 2010, but all subsequent pages are dated October 18, 2010.

[8] The plea agreement provided to us in the Joint Appendix was unsigned. After we directed the parties to file supplemental briefing on the appellate waiver issue, *see infra* Part II.A., the OFPD provided an executed copy of the plea agreement. Therefore, we cite to the executed plea agreement provided to us by the OFPD, and not to the unsigned version contained in the Joint Appendix.

## II.    Discussion[9]

### A.    *Recusal*

Nance first argues that the District Judge committed reversible error by refusing to disqualify himself because, Nance alleges, a reasonable layperson would reasonably question the Judge's impartiality in cases in which the OFPD is counsel. The government disagrees, arguing that we should enforce Nance's appellate waiver of the recusal issue contained in the plea agreement that provides that he could only appeal that issue through an "interlocutory separate filing before the United States Court of Appeals of a mandamus action."  (Appellant's 2/23/12 Ltr., Exhibit 1, at 5.)

Before deciding whether Nance is foreclosed by the terms of the plea agreement from raising the recusal challenge on direct appeal, we must first determine whether the government waived its right to enforce the appellate waiver because it did not raise it until we requested supplemental briefing on the issue.  The government acknowledges that the "fail[ure] to raise … Nance's waiver of the recusal issue in its opening brief … was an oversight, for which [it] apologizes," but argues that the "oversight … does not prevent this Court from considering the government's current argument that … Nance waived his right under his plea agreement to pursue the recusal issue on direct appeal."  (Appellee's 2/23/12 Ltr., at 5.)  We agree.  Even if we construe the government's failure to raise the appellate waiver issue in its initial brief as a concession, we are not bound by the government's initial position, and we can, and will, consider the appellate waiver

---

[9] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

8

issue. *See United States v. Borrero-Acevedo*, 533 F.3d 11, 15 n.3 (1st Cir. 2008) (directing parties to file supplemental briefing on appellate waiver issue after government took position in initial brief that waiver could not be enforced, noting the "court was not bound by a party's concessions," and ultimately enforcing appellate waiver).

Three considerations come into play in determining whether the appellate waiver prevents us from reviewing on direct appeal the merits of Nance's recusal claim: (1) whether pursuing the recusal issue as part of his direct appeal falls within the scope of his appellate waiver; (2) whether he knowingly and voluntarily agreed to the appellate waiver; and (3) whether enforcing the appellate waiver would work a miscarriage of justice. *United States v. Corso*, 549 F.3d 921, 927 (3d Cir. 2008).

Nance first argues that the scope of his appellate waiver does not preclude him from bringing his recusal claim on direct appeal. When considering "the scope of a plea agreement's appellate-waiver provision, we are guided by the well-established principle that plea agreements, although arising in the criminal context, are analyzed under contract law standards." *Id.* (citations and internal quotation marks omitted). It is also well-established that "the language of [an appellate] waiver, like the language of contract, matters greatly to our analysis, and that such waivers must be strictly construed." *Id.* (alteration in original) (citations and internal quotation marks omitted). We do not allow "a defendant to get the benefits of his plea bargain, while evading the costs [because] contract law would not support such a result." *Id.* (alteration in original) (citations and internal quotations marks omitted).

9

The language contained in Nance's appellate waiver regarding the recusal issue is clear.  Nance "waive[d] the right to take a direct appeal from his conviction or sentence" subject to three exceptions that are not pertinent to the recusal claim.  (Appellant's 2/23/12 Ltr., Exhibit 1, at 4-5.)  Although one of those exceptions provided that he may appeal his conviction to challenge certain portions of the Court's order denying his motion to suppress, the agreement provided that his "right to directly appeal … does not include … any issues other than those specified [in that exception],except that th[e] agreement does not prevent the interlocutory separate filing before the United States Court of Appeals of a mandamus action to have the [District] Judge recused from this case." (*Id.*, Exhibit 1, at 5.)  Nance does not dispute that the plea agreement had an appellate waiver that barred him from bringing a recusal claim on direct appeal, nor does he contest that the letter "sets forth the full and complete terms and conditions of the agreement between [him] and the [government], and there are no other agreements, promises, terms or conditions, express or implied." (*Id.*, Exhibit 1, at 8.)

Instead, Nance, citing to the contract law principle that "contract terms will not be construed in such a manner so as to render them meaningless" (Appellant's 2/23/12 Ltr., at 2 (quoting *USX Corp v. Liberty Mutual Ins. Co.*, 444 F.3d 192, 200 (3d Cir. 2006))), claims that to find that he "waived the right to challenge the district court's denial of his motion to disqualify in this appeal would render meaningless th[e] portion of the plea agreement wherein the government agreed that the appellate waiver did not prevent the filing of a mandamus" (*id.*).  That is so, says Nance, "because … on the very day that the government agreed in the plea letter that the appellate waiver did not prevent [him] from

10

filing a mandamus action, it simultaneously argued, in its response to [his] motion to stay the proceedings, that the recusal claim 'may be reviewed on direct appeal,'" and that "'mandamus is not the only adequate means for review of [his] disqualification motion.'" (*Id.* (quoting App. at 771).) Thus, Nance argues, construing "the plea agreement [to] permit[] the government to argue, on the one hand, that an appeal is waived, but that the waiver does not prevent the filing of a mandamus action, and then, at the same time, claim that mandamus is unavailable because the claim can be raised on direct appeal, would render the provision allowing the filing of a mandamus action meaningless." (*Id.*)

Nance's argument distorts the chronology of events. Factually, he is incorrect that the government filed its opposition to his motion to stay on "the very day" that the plea agreement was executed. (*Id.*) While it is true that the government's plea agreement offer was dated October 18, 2010[10] – the same day that the government filed a response to Nance's motion to stay – that plea agreement was not executed by Nance until October 22, 2010. And while it is also true that one paragraph of the government's 12-page motion opposing the stay indicated that Nance's recusal claim could be brought on direct appeal, the government was proceeding on the pre-plea agreement assumption that the case was going to trial since the plea agreement had not been executed as of October 18, 2010. Even Nance recognized as much in his reply to the government's motion opposing his stay when he stated that "[t]he government's claims … are wholly predicated on the assertion that this case is proceeding to a jury trial on November 1, 2010." (App. at 781.)

_____

[10] As noted in *supra* note 7, while the first page of the plea agreement was dated October 15, 2010, the remaining eight pages were dated October 18, 2010.

11

Indeed, had Nance decided not to sign the plea agreement and subsequently been convicted after his trial, he could have raised the recusal issue on direct appeal. In that light, we reject Nance's claim that the government's position in opposing a stay rendered meaningless the plea agreement provision limiting his recusal claim to a mandamus action. That plea agreement allowed Nance to proceed with filing a mandamus action in connection with the recusal claim, something that Nance ultimately chose not to do. Since the plain language of an appellate waiver "matters greatly," *United States v. Goodson*, 544 F.3d 529, 535 (3d Cir. 2008), and that language must be "strictly construed," *United States v. Khattak*, 273 F.3d 557, 562 (3d Cir. 2001), we conclude that Nance's recusal claim on direct appeal falls within the scope of his appellate waiver.

We next consider Nance's argument that his waiver was not knowing and voluntary. In assessing whether a waiver is knowing and voluntary, we must be "satisfied that the district court 'inform[ed] the defendant of, and determine[d] that the defendant underst[ood] … the terms of any plea-agreement provision waiving the right to appeal or to collaterally attack the sentence.'" *United States v. Mabry*, 536 F.3d 231, 239 (3d Cir. 2008) (alterations in original) (quoting Fed. R. Crim. P. 11(b)(1)(N)). Here, a review of the transcript of the plea hearing reveals that the District Court complied with its obligations under Federal Rule of Criminal Procedure 11(b)(1)(N). The Court reviewed the terms of the appellate waiver with Nance, and Nance stated that he understood the waiver's scope. Moreover, the government also reviewed the scope of the waiver at the plea hearing and Nance responded that the government's summary of the

terms was accurate. Those colloquies indicate that Nance knowingly and voluntarily waived his right to file a direct appeal on the recusal issue.

Nonetheless, Nance alleges that "the contradictory statements made by the government in the plea letter and its simultaneously-filed response to [his] stay motion … created ambiguity about whether and how [he] could seek relief from the district court's denial of the disqualification motion." (Appellant 2/23/12 Ltr., at 3.) Nance relies on *United States v. Saferstein*, in which we observed "that a statement made by the sentencing court during the [plea] colloquy can create ambiguity where none exists in the plain text of the plea agreement." 673 F.3d 237, 243 (3d Cir. 2012). Nance argues that "[j]ust as 'a defendant cannot be expected to distinguish and disregard [a court's statements] that deviate from the language of a particular provision in a lengthy plea agreement[,]' the same is true here of the government's statements that deviated from the language in the agreement." (Appellant's 2/23/12 Ltr., at 3 (alterations in original) (quoting *Saferstein*, 673 F.3d at 243).) The principle from *Saferstein* that Nance relies on, however, does not help him here. Unlike in *Saferstein* where the court's statements at the plea hearing injected ambiguity into an otherwise unambiguous plea agreement, here the District Court's colloquy at the plea hearing plainly reaffirmed the terms of the clear and unambiguous appellate waiver contained in Nance's plea agreement. *Saferstein* does not stand for the proposition, as Nance implies, that an opposing party's statement in a context outside the plea process can modify the unambiguous terms of the plea agreement. Therefore, we conclude that Nance's plea was knowing and voluntary.

13

Finally, Nance argues that, even if we determine that bringing his recusal claim on direct appeal falls within the scope of the appellate waiver, and that the plea agreement was knowingly and voluntarily executed, we still should "nevertheless permit him to challenge the district court's denial of the motion to disqualify because enforcing the appellate waiver would result in a miscarriage of justice." (Appellant's 2/23/12 Ltr., at 4.) It is true that "[t]here may be an unusual circumstance where an error amounting to a miscarriage of justice may invalidate the waiver."[11] *Khattak*, 273 F.3d at 562. Nance proposes that the unusual circumstance here that amounts to a miscarriage of justice is that his counsel was ineffective by failing to preserve his right to bring the recusal claim on direct appeal.[12] Specifically, Nance asserts that "[i]n light of the simultaneous and contradictory statements about whether and how [he] could seek relief from the district court's denial of the disqualification motion, it was incumbent upon counsel to act to ensure that [he] would have the right to raise the recusal issue." (Appellant 2/23/12 Ltr., at 5.) Thus, Nance concludes, counsel's failure to ensure that the recusal claim could be

_____

[11] We have "cho[sen] not to earmark specific situations" that would invalidate a knowing and voluntary waiver. *Khattak*, 273 F.3d at 563; *see id.* ("[E]ndors[ing] the First Circuit's approach" to consider "certain factors" such as "[t]he clarity of the error, its gravity, its character …, the impact of the error on the defendant, the impact of correcting the error on the government, and the extent to which the defendant acquiesced in the result," but noting that "the governing standard to apply … is whether the error would work a miscarriage of justice" (citation omitted)).

[12] Nance does not assert, however, that the government's statements in opposing his motion to stay equate to a miscarriage of justice and thus warrant barring enforcement of the appellate waiver.

14

raised on direct appeal in addition to being raised in a mandamus action "constitutes ineffective assistance of counsel sufficient to overcome an appellate waiver."[13] (*Id.*)

"We have repeatedly expressed our strong preference for reviewing allegations of ineffective assistance of counsel in collateral proceedings under 28 U.S.C. § 2255 rather than on direct appeal." *United States v. Sandini*, 888 F.2d 300, 312 (3d Cir. 1989).[14] In the context of a collateral attack, we acknowledge that we have said that a miscarriage of justice may exist in a case "raising allegations that counsel was ineffective or coercive in negotiating the very plea agreement that contained the waiver." *Mabry*, 536 F.3d at 243. We also note, however, that an appellate waiver does not "become[] unenforceable simply because a defendant 'claims' … ineffective assistance of counsel." *United States v. Monzon*, 359 F.3d 110, 118 (2d Cir. 2004). Rather, the record must "reveal[] that the claim that the waiver was the result of ineffective assistance of counsel was meritorious." *Id.* at 118-19. If the merits of such a claim "cannot be determined on the basis of the record on appeal, it is appropriate to enforce the appeal waiver." *Id.* at 119. Here, nothing in the record reveals that Nance's counsel was ineffective in negotiating the plea agreement. But because the ineffective-assistance-of-counsel claim may "involve

---

[13] We note the irony of the OFPD, as Nance's counsel on appeal, asserting that one of its own attorneys was ineffective in the District Court proceedings to preserve Nance's right to bring the recusal issue on direct appeal.

[14] Although Nance says that we have "noted with approval the Seventh Circuit's holding that 'ineffective assistance of counsel qualifies as a miscarriage of justice sufficient to overcome a waiver-of-appeal provision'" (Appellant's 2/23/12 Ltr., at 4 (quoting *United States v. Shedrick*, 493 F.3d 292, 298 n.6. (3d Cir. 2007) (citing *United States v. Joiner*, 183 F.3d 635, 645 (7th Cir. 1999)))), the ineffective-assistance-of-counsel claim in *Shedrick* itself was brought in a collateral proceeding under 28 U.S.C. § 2255.

15

allegations and evidence that are either absent from or not readily apparent on the record," *Sandini*, 888 F.2d at 312, we decline, on direct appeal, to pass judgment on the effectiveness of counsel and will permit the waiver to stand.

In sum, because Nance's recusal claim in this context falls within the scope of his appellate waiver, he knowingly and voluntarily agreed to that waiver, and he asserts no miscarriage of justice that we can review on direct appeal that would bar us from enforcing that waiver, we decline to exercise jurisdiction to review the merits of the recusal claim here.

B.    *Motion to Suppress*

Nance also argues that the District Court erred when it denied his motion to suppress because he alleges that the probable cause affidavit attached to the Second Search Warrant lacked any facts or reasonable inferences that could lead a magistrate to conclude that a nexus existed between Nance's alleged criminal activity and room 25 at the Motel 3.[15] We disagree.

---

[15] The government asserts that, because Nance did not raise that argument before the District Court, it was "not addressed in the District Court's Order[,] and [is] not exempted from the terms of the appellate waiver." (Government's Br. at 18.) In Nance's motion to suppress, however, he argued:

> [That] there is not an iota of information that provides a **nexus** between Mr. Nance's offenses and the places to be searched. In other words, the warrant requests *assume* that because of the evidence seized and information learned, the police should be permitted to search any room … associated with Mr. Nance anywhere in the world.

(App. at 163.) Although Nance did not argue that nexus was specifically lacking to room 25 of the Motel 3, Nance did sufficiently challenge whether there was adequate nexus to his motel room, and we thus reject the government's assertion that he waived his right to bring this argument on appeal.

The Fourth Amendment guarantees that the government may not search or seize an individual's property without a warrant based on "probable cause, supported by …[an] affirmation, and particularly describing the place to be searched, and the … things to be seized." U.S. Const. amend. IV.  "Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  "An affidavit [for a warrant] must provide the magistrate with a substantial basis for determining the existence of probable cause … ." *Gates*, 462 U.S. at 239.

"We exercise plenary review of the District Court's denial of [a] motion to suppress." *United States v. Zimmerman*, 277 F.3d 426, 432 (3d Cir. 2002) (citation omitted).  "Thus, we apply the same standard the District Court … appl[ied] and determine whether the magistrate who issued the warrant had a 'substantial basis' for determining that probable cause existed." *Id.* (citation omitted).  Although "reviewing courts should [not] simply rubber stamp a magistrate's conclusions," we accord them "great deference." *Id.* (citations and internal quotation marks omitted).

A magistrate judge is tasked with "'mak[ing] a practical, common-sense decision whether … there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Jones*, 994 F.2d 1051, 1056 (3d Cir. 1993) (ellipsis in original) (quoting *Gates*, 462 U.S. at 238).  "[I]t is well established that direct evidence is not required for the issuance of a search warrant." *Id.*  Rather, in determining whether there is a sufficient nexus to justify a search, "probable cause can be, and often is, inferred by considering the type of crime, the nature of the items sought, the suspect's

17

opportunity for concealment and normal inferences about where a criminal might hide [the contraband]." *Id.* (citation and internal quotation marks omitted). "Because probable cause is a 'practical, nontechnical conception,' we are concerned with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Unites States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010) (quoting *Gates*, 462 U.S. at 231).

In this case, there was a substantial basis for the magistrate judge to determine that there was probable cause to believe that contraband was located in room 25 of the Motel 3. First, it was reasonable for the magistrate judge to infer that there was evidence of criminal activity wherever Nance was residing. The affidavit to the Second Search Warrant explained that Nance was found in possession of two counterfeit bills, a credit card in another person's name, a hotel receipt in that person's name, and receipts indicating that Nance had recently purchased two computers and a laser jet printer, known to be tools used by counterfeiters. That affidavit also indicated that Nance possessed a computer thumb drive and a wireless internet card. Moreover, that affidavit explained that Nance was wanted for, among other crimes, forgery and unlawful use of a computer.

Second, it was reasonable to infer that Nance had been residing at room 25 at the Motel 3. The affidavit provided that Nance had indicated at his arraignment that he was staying at the Motel 3. The affidavit then stated that room 25 at Motel 3 was currently rented to Nance, and requested authorization to search that room for further evidence of forgery, fraud, or theft. The affidavit would have been more clear if it had stated that the

officers went to the Motel 3, asked an employee if Nance was staying there, and that the employee had informed them that Nance was staying in room 25, but the fact remains that the affidavit stated that Nance was renting room 25 at the Motel 3, a motel where Nance had admitted that he was residing. *Cf. Jones*, 994 F.2d at 1057 (acknowledging that while the officer "might have been able to supply the magistrate judge with a stronger link to the defendants' residences, … he did bring the evidence he had to a magistrate judge, who determined that there was probable cause to issue the warrants").

"[W]e are mindful that a grudging or negative attitude by reviewing courts towards warrants is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." *Id.* (citation and internal quotations marks omitted). "Admittedly most of the information in the affidavit served to link [Nance] to the crime[s] in general." *Id.* at 1056. That information, however, "in conjunction with the other facts in the affidavit … provided a sufficient link between [room 25 of the Motel 3] and the crime[s]." *Id.* Accordingly, the magistrate judge had a substantial basis for determining, based on reasonable inferences, that evidence of criminal activity was located where Nance was residing, and that Nance was residing in room 25 of the Motel 3. Thus, probable cause existed to search that location.[16]

---

[16] Because we find that the magistrate had a substantial basis to find probable cause, we need not address whether the good faith exception to the exclusionary rule under *Leon* applies here. *See United States v. Williams*, 3 F.3d 69, 74 (3d Cir. 1993) ("Suppression is therefore inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority." (citing *Leon*)). We do, however, note one disturbing portion of the Second Search Warrant that would give us pause if we had to determine whether the good faith exception did apply. The application for the Second Search Warrant included among the items to be searched and seized "all computer

## III. Conclusion

For the foregoing reasons, we will affirm.

---

internal and peripheral storage devices" and provided that those "items [would] be seized and then later searched for evidence relating to the possession and / or distribution of child pornography." (App. at 222.) However, there was no evidence presented in the probable cause affidavit to support a search for child pornography, and the mention of it appears to be a "cut and paste" error. In addition to noting the carelessness of the affiant, we caution both issuing magistrate judges and executing officers to ensure that all items listed to be searched and seized are supported by probable cause.