PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-3893
_____

UNITED STATES OF AMERICA

v.

CARLO DANIEL CASTRO,

                                                    Appellant.
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 10-cr-732)
District Judge:  Hon. Harvey Bartle, III
_____

Argued
September 25, 2012

Before:   McKEE, *Chief Judge*, JORDAN, and VANASKIE,
*Circuit Judges*.

(Filed: January 8, 2013)
_____

Peter Goldberger   [ARGUED]
50 Rittenhouse Place
Ardmore, PA   19003
  *Counsel for Appellant*

Louis D. Lappen   [ARGUED]
Office of United States Attorney
615 Chestnut Street - #1250
Philadelphia, PA   19106
  *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Daniel Castro, a high-ranking official in the Philadelphia Police Department, was indicted in connection with three separate schemes to extort money from separate individuals by use of violence. He was convicted by a jury on one count of making a material false statement to federal agents in violation of 18 U.S.C. § 1001, and acquitted on one count of conspiracy to commit extortion in violation of 18 U.S.C. § 894. The jury hung on the remaining eight counts.

To avoid a retrial, Castro pled guilty to a count of conspiracy to commit extortion in violation of 18 U.S.C. § 1951. In exchange the government agreed to dismiss the remaining charges against him. Castro's plea agreement contained an appellate waiver provision under which, subject to some exceptions, he "voluntarily and expressly waive[d] all rights to appeal or collaterally attack" his "conviction,

2

sentence, or any other matter relating to this prosecution." (App. at 127.) The District Court sentenced him to concurrent sentences of 18 months in prison for his conviction for false statements and 60 months in prison for his conviction by guilty plea for conspiracy to commit extortion.

In this appeal, Castro challenges three facets of his conviction and sentence. First, he contends that there was insufficient evidence to convict him of making a false statement to the FBI about money allegedly received from an extortion victim. He argues that, because the money in question came from the FBI in the course of a sting operation, he told the literal truth when he denied having received any money from the alleged victim. Second, Castro challenges the District Court's authority to deny the government's motion, made pursuant to § 3E1.1(b) of the United States Sentencing Guidelines, for a one level decrease in his offense level calculated under the guidelines. Third, Castro maintains that, in arriving at a sentence that was 19 months higher than the top of the range recommended by the guidelines, the District Court failed to adequately account for his record of good works. The government responds that Castro's first two arguments are barred by his appellate waiver and that, as to the third argument, Castro cannot show that the sentence is unreasonable.

We conclude that the appellate waiver encompasses both Castro's challenge to the sufficiency of the evidence and his claim that the District Court lacked authority to deny the government's motion for a one level decrease in his offense level. However, while the waiver properly applies to prevent our considering the District Court's refusal to award the

3

requested downward departure, we conclude that application of the waiver against the sufficiency-of-the-evidence argument would, in the unusual circumstances of this case, work a miscarriage of justice. We will therefore vacate Castro's conviction and 18-month sentence for making a false statement to federal agents. We will also vacate Castro's 60-month sentence because the invalid conviction for false statements was included in calculating Castro's overall offense level, causing that level to be higher than it otherwise would have been and resulting in a sentencing range that is no longer applicable. We are accordingly not in a position to evaluate Castro's reasonableness challenge, and we will remand the case to the District Court for resentencing solely on the conviction for conspiracy to commit extortion.

## I. Background

### A. *Facts*

Castro rose from challenging circumstances to become one of the highest ranking officers in the Philadelphia Police Department. During his 25 years of service as a policeman, he received numerous accolades and advancements, only a handful of which we mention here. In 1997, he was promoted to Captain. In 2001, he was nominated by the then-Mayor of Philadelphia, Edward Rendell, and Police Commissioner John Timoney to represent the Philadelphia Police Department as an Eisenhower Fellow, an important position that placed Castro in contact with community leaders from business, academia, and political and non-profit organizations, and allowed him to be part of international leadership mentoring programs. And in 2010, he was promoted to the position of Inspector, a high-ranking position within the police force. By

4

all accounts, Castro was well regarded within the Philadelphia Police Department, and, as noted below, he saw himself as a viable candidate to one day become police commissioner. His successes and substantial authority make his subsequent criminal behavior all the more disturbing and damning.

In 2006, Castro invested $90,000 in a residential real estate development project organized by an acquaintance named Wilson Encarnacion. When the project failed, Castro repeatedly and unsuccessfully sought repayment from Encarnacion. The lost investment represented Castro's life savings.

In 2010, Castro discussed with another acquaintance, Rony Moshe, his frustration over the personally disastrous investment. Moshe mentioned that he knew a couple of tough debt collectors, and Castro asked if Moshe could engage the collectors to pressure Encarnacion to repay Castro's losses – losses that Castro evidently thought of as a debt Encarnacion owed him. Unbeknownst to Castro, Moshe was an FBI informant. He reported his conversation with Castro to the FBI, and an investigation was launched. At the FBI's behest, Moshe began secretly recording telephone conversations and in-person meetings with Castro. The undercover operation ran from April through November of 2010.

On April 7, 2010, Moshe told Castro in a series of recorded telephone calls that he had found a "collector" for Castro who was willing to collect the $90,000 debt from Encarnacion. Although Castro's loss on the failed investment was $90,000, he instructed Moshe to have the collector demand $150,000. When Moshe told Castro that the collector would use threatening and intimidating collection methods,

5

Castro responded that he did not want to know the specific methods, that he did not want to meet the collector, and that he did not want the collector to know Castro's identity. Castro emphasized that he did not want to get "implicated into this." (App. at 1291.) But he went ahead and provided Moshe with Encarnacion's home address, and he told Moshe to send the collector there because Encarnacion's wife and child would be there and "they'll get scared." (App. at 346.)

Later, on June 4, Castro spoke by telephone with an undercover FBI agent posing as the collector. In that conversation, which was recorded, the agent told Castro that he and an associate had obtained $5,000 from Encarnacion and had $4,500 to give to Castro, with $500 being withheld as a collection fee. The agent represented that Encarnacion had initially denied owing Castro any money but relented after the agent and his associate went inside Encarnacion's house and the agent threatened Encarnacion by telling him that he would "f--- his wife" if he refused to pay. (App. at 1321-23.)

On June 11, Castro met with Moshe, who gave Castro the $4,500 supposedly collected from Encarnacion. Moshe said that, following Encarnacion's encounter with the collector, Encarnacion was "scared to death." (App. at 3691.) Castro replied, "Good, Good, Good." (App. at 361.) Castro acknowledged that the collector "mean[t] serious business," and he mentioned that he was concerned that Encarnacion might go to the police. (App. at 1332-33, 360-62.)

Castro met with Moshe again on July 20, 2010, and Moshe gave him another $2,100 that the collector had supposedly obtained from Encarnacion. That money, like the first payment, came from the FBI. There is no evidence that

6

Encarnacion was aware of the FBI's payments to Castro or that the FBI's payments somehow reduced a debt actually owed by Encarnacion. Moshe stated that if Castro wanted to recover his money more quickly, the collector would have to become "more aggressive." (App. at 377.) Castro was hesitant to authorize more aggressive tactics, telling Moshe, "I can't get myself in trouble. … I want to be Police Commissioner." (App. at 564.) Nevertheless, Castro urged Moshe to have the collector go back to Encarnacion's home and collect more money – "$10,000 at a shot." (App at 384.)

Around that time, the undercover operation paused for nearly two months because Moshe suffered a stroke. In early September 2010, Moshe and Castro resumed speaking and, on September 10, Moshe told Castro that Encarnacion was refusing to pay. Moshe asked Castro if he wanted the collector to "rough him up." (App. at 1369-70.) Castro responded, "Well, get, get my money. I want, I want my money. They, they, they, they know how to get it." (App. at 1371.) When Moshe said that the collector might "break[] a leg, a hand, you know," Castro responded, "I don't, I don't want the guy dead. I don't, I don't want to kill him." (App. at 1373-76.)

During that conversation Castro broached the topic of a second debt collection effort. Castro told Moshe of two acquaintances, business partners Billy Wong and Alan Kats, who were looking to hire a debt collector. Moshe noted that, to extract money, the collectors would have to get rough with Wong's and Kats's debtor. Castro asked Moshe to meet with Wong on September 15, 2010. Castro admitted in his testimony at trial that he understood, as of that date but not before, that the supposed collectors would batter Wong's and

7

Kats's debtor. He also acknowledged that he became aware at that time that the collectors Moshe had engaged for him would use threats of violence and, if necessary, actual violence to get money from Encarnacion. (District Court Docket Item ("D.I.") 90:228-29 (Tr. 4/14/11) (Castro: "On [September 10], I crossed the line … . Q: [Wong and Kats' debtor is] gonna get beaten, right? Just like [Encarnacion] – gonna get beaten, isn't that right? A: You can safely inference that, yes, sir.")).

On September 15, 2010, Moshe met with Wong and Kats, who explained that they needed help collecting $26,000 that had been lost in a failed nightclub investment. Moshe told them about the collector whom he had used for Castro, and Kats told Moshe to go ahead and engage the collector's services. Wong and Kats understood that compelling their "debtor" to pay would involve threats of violence and, perhaps, actual violence. On September 22, Wong and Kats met with an undercover FBI agent posing as the collector, and Kats authorized the agent to use violence to collect the money. Later, on October 1, 2010, the undercover agent gave Kats $3,000 supposedly collected from the debtor, and approximately a month after that, the agent similarly gave Kats an additional $5,000.

On September 21, 2010, Moshe again spoke to Castro about the effort to collect money from Encarnacion. He said that the collectors had recovered a "pretty big chunk" of money by getting "pretty rough" with Encarnacion. (App. at 400-01.) Castro replied, "They got the end result." (App. at 401.) About one week later, Moshe gave Castro $14,000 out of $15,000 that had supposedly been collected from Encarnacion, plus a $500 "referral fee" for referring Wong

8

and Kats to the "collectors." (D.I. 91:87-88 (Tr. 4/15); D.I. 137:22 (Plea).) During that meeting, Castro also told Moshe of a third collection job to refer to the collectors, this time for $1.5 million in Florida.

Soon thereafter, on October 4, 2010, FBI agent Brian Nichilo and Detective Steve Snyder of the Philadelphia Police conducted an unrecorded interview with Castro in which they pretended to be investigating a complaint from Encarnacion that he was being threatened in relation to a debt he owed. According to Nichilo's testimony at trial, Castro claimed that he had not discussed with anyone the collection of a debt from Encarnacion,[1] that he did not hire anyone to extort money from Encarnacion,[2] and that he had not received any money from Encarnacion. Specifically, Nichilo testified that he asked Castro "whether he had ever collected any money from Mr. Encarnacion since he originally gave him the $90,000 in 2006." (App. at 105-06.) Castro responded, according to Nichilo, that he had not collected any money from Encarnacion. (App. at 106.) In his own trial testimony

---

[1] Count Four, on which the jury hung, charged Castro with making a false statement to the FBI in violation of 18 U.S.C. § 1001 when he "told FBI agents that, outside of [a civil] lawsuit [against Encarnacion] and general complaining to friends," he had "not had any discussions with anyone about how he could collect from [Encarnacion]." (App. at 40.)

[2] Count Five, another count on which the jury hung, charged Castro with making a false statement to the FBI by stating that "he did not hire anyone to threaten or hurt [Encarnacion] to collect the debt." (App. at 41.)

9

regarding that interview with law enforcement officials, Castro admitted that he had "lied" when he "told them I didn't know anything about what they asked me," (App. at 121), and that he did not "tell them the truth." (App. at 906.) But Castro denied making the particular statements recounted by Nichilo.

On October 12, 2010, Castro described his meeting with the FBI to Moshe. Castro instructed Moshe to cease collecting money from Encarnacion "for right now" (App. at 407), but he asked Moshe to have the collectors go to Florida to commence a collection effort there.

Castro was arrested on November 5, 2010. FBI agents searched his home and recovered the money that he had received from Moshe and that he had been told came from Encarnacion.

B.    *Course of Proceedings*

A federal grand jury in the Eastern District of Pennsylvania returned a ten-count superseding indictment on February 3, 2011, against Castro. Only two counts are of importance to this appeal. Count Three charged that on October 4, 2010, in violation of 18 U.S.C. § 1001, Castro made a false statement to federal law enforcement officers in connection with his efforts to collect money from Encarnacion – specifically, "that he had not received any payments from [Encarnacion] towards the debt [Encarnacion] supposedly owed" him. (App. at 39.) Count Nine charged

10

Castro with conspiring with Wong and Kats to commit extortion in violation of 18 U.S.C. § 1951.[3]

A jury convicted Castro on Count Three, acquitted him on Count Ten, which charged the use of extortionate means to collect a debt, in violation of 18 U.S.C. § 894, and returned a hung verdict on the remaining eight counts. To avoid a scheduled retrial, Castro entered into a plea agreement with the government, pursuant to which he pled guilty to Count Nine. The agreement included a broad waiver of his appellate rights.

At sentencing, the parties agreed that the combination of convictions on Counts Three and Nine led, under the applicable sentencing guidelines, to a sentencing range of 30 to 37 months, based on an offense level of 19 and criminal history category of I. The government also agreed to file a motion seeking a three-level downward departure under § 3E1.1(b) of the guidelines. Pursuant to that provision of the guidelines, the typical two-level reduction of a defendant's offense level gained by accepting responsibility can become a three-level reduction if the government files a motion stating that "the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial

---

[3] Wong, who was also charged in Counts Nine and Ten of the superseding indictment, pled guilty to those counts and agreed to testify against Castro. Kats was charged in a separate indictment for his involvement in the extortion scheme, and he pled guilty to attempted collection of credit by extortionate means.

11

and permitting the government and the court to allocate their resources efficiently[.]"[4]  When the government made that motion in this case, however, the Court *sua sponte* rejected it, making Castro's offense level 20 (instead of 19), and accordingly making the guidelines range 33 to 41 months (instead of 30 to 37 months).  The Court then imposed an upward variance to bring the sentence to 60 months in prison on Count Nine, concurrent with 18 months on Count Three, to be followed by three years of supervised release.  The Court also imposed a $10,000 fine and $200 in special assessments.

Castro then filed this timely appeal.

---

[4] Section 3E1.1 provides in full:

(a) If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels.

(b) If the defendant qualifies for a decrease under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and upon motion of the government stating that the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, decrease the offense level by 1 additional level.

U.S. Sentencing Guidelines Manual § 3E1.1.

## II.    Discussion[5]

Castro raises three arguments on appeal.  First, he contends that his conviction should be vacated because "there was a complete failure of proof on Count Three," which charged him with "knowingly making a false statement to the FBI" by lying when he denied that he had received any money from Encarnacion in repayment of the $90,000 lost investment.  (Appellant's Br. at 16.)  Castro argues that, in fact, he "had not received any such repayments" from Encarnacion but had instead received money from the FBI in a sting operation.  (*Id.*)  Thus, he says, his denial "was not 'false,' much less 'knowingly' so."  (*Id.*)  He reasons that since his denial was literally true, even if he did not appreciate it as such, "the evidence was insufficient to convict on Count Three," and his conviction on that count must "be vacated and the case remanded for resentencing on Count Nine alone."  (*Id.*)

Second, Castro maintains that his sentence was procedurally unreasonable because the District Court erroneously denied the government's motion that his offense level be reduced not just two points but three points for "acceptance of responsibility" under the sentencing guidelines.  He argues that § 3E1.1(b) of the guidelines confers upon the government, not the court, "the discretion … to allow a third level of reduction," (*id.*), and that this

---

[5] The District Court had subject matter jurisdiction under 18 U.S.C. § 3231, because the indictment alleged offenses against the United States.  We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

discretion is entitled to "full deference." *United States v. Drennon*, 516 F.3d 160, 162 (3d Cir. 2008).

Third, Castro asserts that his 60-month sentence is procedurally and substantively unreasonable because the guidelines range determined by the District Court suggested a period of imprisonment of 33 to 41 months. He argues that the Court did not adequately take into account evidence of his good character and failed to explain why such a harsh sentence was necessary to fulfill the proper purposes of sentencing.

The government responds that Castro's first two challenges are barred by the appellate waiver contained in his plea agreement. In the alternative, the government argues that even if the appellate waiver does not foreclose Castro's claims, neither issue was raised in the District Court, and Castro cannot show that either of those claimed problems rises to the level of plain error. The government concedes that Castro's third argument is not barred by the appellate waiver, but it argues that "Castro cannot show that no reasonable court would have imposed such a sentence under [the] circumstances" of this case. (Appellee's Br. at 24-25.)

In the sections that follow, we address each of Castro's three arguments, with the first two arguments being affected by his appellate waiver.

A. *Sufficiency of the Evidence for Castro's Conviction for False Statements*

Before addressing either of Castro's first two contentions, we must first determine whether his appellate

waiver bars us from even considering them. As part of his plea agreement, Castro generally agreed that he would neither appeal nor present any collateral challenge to his conviction or sentence. In pertinent part, the appellate waiver provides that, "[i]n exchange for the undertakings made by the government in entering this plea agreement, the defendant voluntarily and expressly waives all rights to appeal or collaterally attack the defendant's conviction, sentence, or any other matter relating to this prosecution[.]" (App. at 127.) The waiver does, however, contain two exceptions that are relevant to this appeal: first, the waiver does not "bar the assertion of constitutional claims that the relevant case law holds cannot be waived" (App. at 127); and, second, the waiver allows appeal for "claims that … the sentencing judge, exercising the Court's discretion pursuant to *United States v. Booker*, 543 U.S. 220 (2005), imposed an unreasonable sentence above the final Sentencing Guideline range determined by the Court." (App. at 128.)

"We exercise plenary review in deciding whether an issue raised by a defendant falls within the scope of an appellate waiver in his plea agreement." *United States v. Goodson*, 544 F.3d 529, 537 n.6 (3d Cir. 2008). When "the government invokes an appellate-waiver provision … , we must determine as a threshold matter whether … [that] waiver prevents us from exercising our jurisdiction to review the merits of the defendant's appeal." *United States v. Corso*, 549 F.3d 921, 926 (3d Cir. 2008) (citations omitted). "We decline to exercise jurisdiction over the appeal where [1] the issues on appeal fall within the scope of the waiver and [2] the defendant knowingly and voluntarily agreed to the waiver, unless [3] 'enforcing the waiver would work a miscarriage of justice.'" *United States v. Saferstein*, 673 F.3d 237, 242 (3d

15

Cir. 2012) (quoting *Corso*, 549 F.3d at 927); *accord United States v. Hahn*, 359 F.3d 1315, 1325 (10th Cir. 2004) (en banc).

Under the first prong, we evaluate the language of the appellate waiver to determine if the disputed appeal falls within its scope. We follow the "well-established principle that plea agreements, although arising in the criminal context, are analyzed under contract law standards." *Goodson*, 544 F.3d at 535 n.3 (alteration and internal quotation marks omitted). "[I]n light of those standards, the language of an appellate waiver, like the language of a contract, matters greatly to our analysis[.] [S]uch waivers must be strictly construed." *Corso*, 549 F.3d at 927 (citation, alteration, and internal quotation marks omitted); *cf. United States v. Williams*, 510 F.3d 416, 422 (3d Cir. 2007) ("In view of the government's tremendous bargaining power courts will strictly construe the text [of a plea agreement] against the government when it has drafted the agreement." (alterations omitted)). "But we are also mindful that under contract principles, a plea agreement necessarily works both ways. Not only must the government comply with its terms and conditions, but so must the defendant." *Corso*, 549 U.S. at 927 (citations, alteration, and internal quotation marks omitted). Accordingly, a defendant cannot "get the benefits of his plea bargain, while evading the costs because contract law would not support such a result." *Id.* (alteration and internal quotation marks omitted).

The second step in reviewing an appellate waiver is to determine whether the waiver is knowing and voluntary. "[T]he role of the sentencing judge is critical" in that regard, *United States v. Khattak*, 273 F.3d 557, 563 (3d Cir. 2001),

16

because rule 11(b)(1)(N) of the Federal Rules of Criminal Procedure provides that

> Before accepting a plea of guilty or nolo contendere, … the court must address the defendant personally in open court. During this address, the court must inform the defendant of, and determine that the defendant understands the following: … the terms of any plea-agreement provision waiving the right to appeal or to collaterally attack the sentence.

Fed. R. Crim. P. 11(b)(1)(N). We have held that "a statement made by the sentencing court during the [plea] colloquy can create ambiguity where none exists in the plain text of the plea agreement," *Saferstein*, 673 F.3d at 243, and such ambiguity may result in a narrow construction of an appellate waiver, "to protect the defendant as the weaker bargaining party," *id.*

The third and last step is to determine whether enforcing the waiver would result in a miscarriage of justice. When a waiver encompasses the issue on appeal and was entered knowingly and voluntarily, it must be enforced except in the "unusual circumstance" of "an error amounting to a miscarriage of justice." *Khattak*, 273 F.3d 562. Certain factors weigh in the determination of whether a given error meets that standard:

> [T]he clarity of the error, its gravity, its character (e.g., whether it concerns a fact issue, a sentencing guideline, or a statutory

17

maximum), the impact of the error on the defendant, the impact of correcting the error on the government, and the extent to which the defendant acquiesced in the result.

*Id.* at 563 (internal quotation marks omitted). Courts apply the "miscarriage of justice" exception "sparingly and without undue generosity," *United States v. Wilson*, 429 F.3d 455, 458 (3d Cir. 2005) (internal quotation marks omitted), but with the aim of avoiding "manifest injustice," *United States v. Gwinnett*, 483 F.3d 200, 206 (3d Cir. 2007).[6]

---

[6] It is not enough that an issue be meritorious:

[B]y waiving the right to appeal, a defendant necessarily waives the opportunity to challenge the sentence imposed, regardless of the merits. … A waiver of the right to appeal includes a waiver of the right to appeal difficult or debatable legal issues – indeed, it includes a waiver of the right to appeal blatant error. Waiver would be nearly meaningless if it included only those appeals that border on the frivolous. … While it may appear unjust to allow criminal defendants to bargain away meritorious appeals, such is the necessary consequence of a system in which the right to appeal may be freely traded.

*Khattak*, 273 F.3d at 561-62 (internal quotation marks omitted).

18

### 1. *Scope of the Appellate Waiver*

This case presents a procedural anomaly. Ordinarily, plea agreements are entered before any trial in a case, but Castro entered his plea agreement in anticipation of a second trial, after he had been tried once and convicted on one of ten counts. Our first task in determining whether Castro's appellate waiver should be enforced to prevent him from challenging his conviction for the crime charged in Count Three is to determine whether the waiver even encompasses that conviction.

Castro asserts that the language of the appellate waiver does not clearly apply to his conviction at trial. Because plea agreements are to be "strictly construed" against the government, *Khattak*, 273 F.3d at 562, he says that his appellate waiver should not apply to his conviction on Count Three. He cannot, however, wish away the words of the waiver. The plea agreement provides that Castro "voluntarily and expressly waives all rights to appeal or collaterally attack [his] conviction, sentence, or any other matter relating to this prosecution." (App. at 127.) The breadth of the phrase "any other matter relating to this prosecution" surely encompasses Castro's earlier conviction on Count Three, and Castro's attempt to argue otherwise is unavailing.

### 2. *Knowing and Voluntary Waiver*

But understanding the linguistic scope of the waiver is only the first step in determining whether the waiver applies. Castro claims that, during the Rule 11 colloquy, the District Court did not mention his earlier conviction, and that he was therefore under the impression that the waiver did not apply

to that conviction. Instead, says Castro, the Court consistently emphasized that he was giving up his right to a second trial and the right to appeal his sentence. Thus, Castro argues, "it is at least reasonable to conclude that the plea agreement did not concern the count on which there had already been a full trial." (Appellant's Reply Br. at 5.)

Although he does not say so explicitly, Castro appears to be seeking shelter in our precedent that a judge's affirmative statements during a plea colloquy can sometimes overcome the otherwise plain terms of a plea agreement.[7] Such judge-created "ambiguity" must be construed "against the government," *Saferstein*, 673 F.3d at 243, because, "[i]f it is reasonable to rely upon the court's words for clarification, then we cannot expect a defendant to distinguish and disregard those statements of the court that deviate from the language of a particular provision in a lengthy plea agreement," *United States v. Wilken*, 498 F.3d 1160, 1168 (10th Cir. 2007).

Castro's argument is an elaboration on that precedent. He argues in essence that, by talking at length about the rights he would give up by foregoing a second trial, the District Court left him thinking that the waiver applied only prospectively and not as to the already fixed history of the case. He suggests, in other words, that it is not only a district court's affirmative statements that can change the scope of a

---

[7] As noted, we have held that, even when the written terms of an appellate waiver are clear, "a statement made by the sentencing court during the colloquy can create ambiguity where none exists in the plain text of the plea agreement." *Saferstein*, 673 F.3d at 243.

plea agreement; a district court's emphases and omissions during a plea colloquy may also alter the defendant's understanding of the plain terms of the plea agreement. We have never so held and we will not do so now.

Indeed, even if we were to accept Castro's assertion that the District Court injected some confusion into the scope of the appellate waiver through emphasis and omission during the plea colloquy, we cannot accept that the colloquy overcame the import that the plea agreement's terms must have had for Castro, a man with years of law enforcement experience and two post-graduate degrees. A deficient plea colloquy will not overcome the plain terms of an appellate waiver when the defendant is highly educated and should accordingly be held to his informed understanding of the text of the waiver. *See Goodson*, 544 F.3d at 540-41 (defendant who was "college educated" and who had "successfully perpetrated wire fraud and the uttering of counterfeit checks" was held to his informed understanding of the plain terms of the plea agreement). Castro affirmed under oath that he understood the plea agreement, and nothing in the record undermines that affirmation. Given the plain terms of the plea agreement in this case, and given Castro's education and professional background, we conclude that he knowingly and voluntarily waived his right to appeal his "conviction … or any other matter relating to this prosecution." (App. at 127.)

3.     *Miscarriage of Justice*

Castro's knowing and voluntary waiver forecloses his appeal of the conviction on Count Three, unless the waiver would result in a miscarriage of justice. Castro says it would, because the record is devoid of evidence that he made a false

21

statement when he stated that he received no money from Encarnacion in repayment of his $90,000 investment. We are compelled to agree.

We have not previously evaluated a challenge to an appellate waiver that is grounded on a claim of insufficiency of evidence amounting to a miscarriage of justice. We have, however, evaluated claims of insufficiency of evidence in the plain error context and have explained that plain error warranting reversal exists when the insufficiency "resulted in a fundamental miscarriage of justice." *United States v. Barel*, 939 F.2d 26, 37 (3d Cir. 1991). To determine if that exacting standard is met, "we review the evidence in the light most favorable to the Government and will sustain the verdict unless a rational juror could not have found that the Government proved" one or more elements of the offense beyond a reasonable doubt. *United States v. Williams*, 299 F.3d 250, 253-54 (3d Cir. 2002). The prosecution's failure to prove an essential element of the charged offense does constitute plain error, *United States v. Wolfe*, 245 F.3d 257, 260-61 (3d Cir. 2001), and so can be understood as a miscarriage of justice, *see United States v. Jones*, 471 F.3d 478, 480 (3d Cir. 2006) ("[A]ffirming a conviction where the government has failed to prove each essential element of the crime beyond a reasonable doubt affect[s] substantial rights, and seriously impugns the fairness, integrity and public reputation of judicial proceedings." (internal quotation marks omitted)).

It bears emphasis, however, that a "manifest miscarriage of justice" warranting reversal on plain error review occurs only where the record is "devoid of evidence pointing to guilt" – a "stricter than usual standard." *United*

22

*States v. Green*, 293 F.3d 886, 895 (5th Cir. 2002) (internal quotation marks omitted); *see also United States v. Vasquez*, 560 F.3d 461, 469 (6th Cir. 2009) ("Because [defendant] failed to move for a judgment of acquittal at either the close of the government's case or the close of his case, we will reverse his conviction only if the record is devoid of evidence pointing to guilt, such that a manifest miscarriage of justice occurred." (internal quotation marks omitted)); *United States v. Irby*, 558 F.3d 651, 653 (7th Cir. 2009) ("[R]eversal is warranted only if the record is devoid of evidence pointing to guilt, or if the evidence on a key element was so tenuous that a conviction would be shocking." (internal quotation marks omitted)); *United States v. Spinner*, 152 F.3d 950, 956 (D.C. Cir. 1998) ("[A] miscarriage [of justice] would exist only if the record is devoid of evidence pointing to guilt, or because the evidence on a key element of the offense was so tenuous that a conviction would be shocking." (alteration and internal quotation marks omitted)).

These insights from the plain error context are applicable to the "miscarriage of justice" argument before us now. *Cf. Hahn*, 359 F.3d at 1327 (holding that for an error to result in a miscarriage of justice that overcomes an appellate waiver "'the error [must] seriously affect[] the fairness, integrity or public reputation of judicial proceedings'" (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993) (alterations in original)). Castro is therefore required to show that, when viewed in the light most favorable to the government, the record is entirely devoid of evidence that he committed each element of a § 1001 offense – specifically, that he made a false statement to government officials when he insisted that he had not received money from Encarnacion in repayment of his $90,000 loan – so that allowing his

23

conviction to stand would "seriously impugn[] the fairness, integrity and public reputation of judicial proceedings." *Jones*, 471 F.3d at 480 (internal quotation marks omitted).

Section 1001 calls for punishment of anyone who "knowingly and willfully … makes any materially false, fictitious, or fraudulent statement or representation" in any matter within the jurisdiction of the federal government. 18 U.S.C. § 1001(a)(2).

> To establish a violation of § 1001, the government [is] required to prove each of the following five elements: (1) that [the accused] made a statement or representation; (2) that the statement or representation was false; (3) that the false statement was made knowingly and willfully; (4) that the statement or representation was material; and (5) that the statement or representation was made in a matter within the jurisdiction of the federal government.

*United States v. Moyer*, 674 F.3d 192, 213 (3d Cir. 2012). It is uncontroverted that all three payments that Castro received, ostensibly in repayment of Encarnacion's "debt," were in fact not from Encarnacion but rather from the FBI through Moshe. None of the money in question actually came from Encarnacion, either directly or indirectly, nor had Castro collected any other money from Encarnacion in repayment for the supposed debt. Castro's statement that he had not received money from Encarnacion, though intended to be a lie, was therefore entirely true, and the government cannot prove the second element of the offense.

That fact is crucial because, to properly convict Castro of violating § 1001, the government must be able to show that he made a statement to government agents that was untrue, and the government cannot satisfy that burden by showing that the defendant intended to deceive, if in fact he told the literal truth.  In *Bronston v. United States*, 409 U.S. 352, 362 (1973), the Supreme Court held that a conviction under the federal perjury statute, 18 U.S.C. § 1621, cannot rest on testimony that is unresponsive to the interrogation, even if intentionally deceptive, so long as the answer in question is literally true and the questioner is free to ask further clarifying questions.  We applied *Bronston* in *United States v. Serafini*, 167 F.3d 812, 822-24 (3d Cir. 1999), affirming the dismissal of a charge under the "false material declarations" statute, 18 U.S.C. § 1623, as applied to grand jury questioning.  In *Serafini*, we also stated that § 1001 is "[a] close kin" to §§ 1621 and 1623.  167 F.3d at 813 n.2.  Thus, the same interpretive principles apply to § 1001 prosecutions as were applied in *Bronston* and *Serafini*.  *See also United States v. Milton*, 8 F.3d 39, 45 (D.C. Cir. 1993) ("The defense of literal truth applies to section 1001 prosecutions … .").  Accordingly, when a statement is literally true, it is, by definition, not false and cannot be treated as such under a perjury-type statute, no matter what the defendant's subjective state of mind might have been.  *Cf. Williams v. United States*, 458 U.S. 279, 284-85 (1982) (a bad check, even when knowingly used to defraud, cannot be a "false statement" within the meaning of 18 U.S.C. § 1014, because as a matter of negotiable instruments law a check makes no assertion about the truth of any matter stated thereon).

25

Viewing the record as required by *Bronston*, it is devoid of evidence that Castro made a false statement when he told government agents that he had not received money from Encarnacion. On the contrary, that statement was completely, if unintentionally, accurate. Thus, allowing his conviction on Count Three to stand would be to allow a conviction when there has been a complete failure of proof on an essential element of the charged crime, and that would seriously impugn the fairness, integrity, and public reputation of our courts. In short, such a conviction constitutes a miscarriage of justice.

The government nevertheless argues that, given Castro's belief that he was lying to FBI agents, there is nothing unfair in his conviction. (*See* Appellee's Br. at 37 ("Castro does not contend that he was unjustly charged with or convicted of this offense, but argues only that the evidence was legally insufficient to support his conviction.").) In the broadest sense, it is surely so that Castro was morally wrong even if not legally guilty, but our legal system does not convict people of being bad. If they are to be convicted, it is for specific crimes, and the government here undertook the burden of proving that Castro had committed each element of the specific crime set forth in § 1001. It failed to do that.

The government tries to work its way around this failure-of-proof problem by arguing for a "sting operation exception" in § 1001 prosecutions. As the government sees it, whether Castro's statements were literally true is irrelevant, as long as he subjectively believed he was lying to the FBI when he made them. A contrary position, the government argues, "would pervert the very purpose of the literal truth defense, which is to protect people from

26

prosecution for literally true responses to the precise question asked, and surely was not intended to protect those who knowingly and willfully lie about their actions solely because they unknowingly acted in collusion with a government agent instead of a true criminal cohort." (Appellee's Br. at 47.)

The ready and dispositive response to that argument is that, even if a "sting exception" to the strictures of § 1001 is a good idea, it is simply not in the statute. Congress knows how to pass laws that penalize statements made to law enforcement officers by a defendant who incorrectly believes the statements to be false. *Compare* 18 U.S.C. § 1956(a)(1) ("knowing" laundering of funds "which in fact involves the proceeds" of a crime), *with id.* § 1956(a)(3) (intentional laundering of funds "represented to be" proceeds of a crime). But it did not do so when it enacted § 1001, and we are not free to amend the law. Under analogous circumstances, the United States Court of Appeals for the Second Circuit reversed as plain error a conviction for "knowing possession" of stolen government property because the property was not actually "stolen" but was rather sold to the defendant by agents in a sting operation. *United States v. Golomb*, 811 F.2d 787, 792-93 (2d Cir. 1987). "Knowledge and belief are very different mental states," the court held, and although the defendant "may very well have believed the checks were stolen, … [the statute] cannot be interpreted to support a conviction when the property at issue was not stolen." *Id.* at 792.

The government nevertheless insists that a jury could conclude, based on the evidence, "that the money Castro received came 'from' Encarnacion." (Appellee's Br. at 41.) According to the government, "[t]he FBI paid $21,000 in real

27

cash to Castro, through its agent, Moshe, and represented through Moshe that the payments were on behalf of Encarnacion. A jury could thus readily determine that Castro received money 'from' Encarnacion, and lied about it to the agents when asked." (*Id.* at 41.) It is not clear how the quotation marks around the word "from" in that sentence help the argument. The money was not "from" Encarnacion in any sense, and we are frankly at a loss to understand the government's assertion that Castro "not only believed that his answer was false … , but it was in fact false." (Appellee's Br. at 50.) There is, quite literally, no evidence whatsoever that even a penny of the money that Moshe handed over to Castro came from Encarnacion. To say, as the government does, that "[t]he FBI actually gave Castro $21,000 on Encarnacion's behalf" (Appellee's Br. at 52), is an invention, since nothing shows that Encarnacion owed Castro anything, much less that he authorized the government to pay Castro on his behalf. Castro is therefore not guilty on Count Three, because the statement set forth in that count simply was not false.[8]

---

[8] The District Court's jury instructions were correct in highlighting that "[a] false … statement … is an assertion which is *untrue when made*." (D.I. 92:150-51 (Tr. 4/18/11) (emphasis added).) The subjective belief of the person making the statement is an entirely separate element of the offense. The false statement must be "*known* by the person making it or using it to be untrue." (*Id.*) In this regard, we note our disagreement with the government's assertion that "the fact that Castro was not charged with attempting to make a false statement is of no consequence." (Appellee's Br. at 52.) What is charged is of enormous consequence, and had

28

The complete failure of proof on the "actual falsity" element of the offense charged in Count Three requires reversal of Castro's conviction on that count, as the conviction is infected with plain error and constitutes a miscarriage of justice.

      B.     *The District Court's Denial of the Government's Motion for an Additional One Point Reduction in Castro's Offense Level for Acceptance of Responsibility*

Castro also contends that his 60-month sentence under Count Nine is procedurally unreasonable because the District Court erred in refusing to reduce his offense level under § 3E1.1(b). In his view, the additional adjustment is mandatory if the government moves for it and the other requirements of the provision are met. Whether that is so is a question we have not addressed but which has divided other circuits. *Compare United States v. Williamson*, 598 F.3d 227 (5th Cir. 2010) (district court has authority to determine whether conditions for one level reduction for acceptance of responsibility under § 3E1.1 have been satisfied), *with United States v. Mount*, 675 F.3d 1052, 1055-57 (7th Cir. 2012) (application of additional one level decrease in defendant's offense level under § 3E1.1 is mandatory). We decline to address that question, however, because it is precluded by Castro's appellate waiver and no miscarriage of justice would result from enforcing the waiver on this point.

---

there been an effort to charge and prove an attempt, there would be another and very different set of legal issues in play.

Castro says that his argument is not precluded by the appellate waiver because it implicates one of the express exceptions contained in the waiver – namely, the exception for "constitutional claims that the relevant case law holds cannot be waived."[9] (App. at 127.) But Castro provides no relevant authority to demonstrate that the "constitutional claims" exception applies in this context. It appears instead that a district court's arguably erroneous calculation of a guidelines range "is precisely the kind of 'garden variety' claim of error contemplated by [an] appellate waiver." *Sotirion v. United States*, 617 F.3d 27, 38 (1st Cir. 2010). It is not a "miscarriage of justice." *See Corso*, 549 F.3d at 931-32 ("[A]llow[ing] alleged errors in computing a defendant's sentence to render a waiver unlawful would nullify the waiver based on the very sort of claim it was intended to waive." (second alteration in original) (internal quotation marks omitted)); *United States v. Price*, 558 F.3d 270, 283-84 (3d

_____

[9] Castro does not claim, as he did when arguing that his conviction under Count Three was not covered by the appellate waiver provision, that the District Court's plea colloquy injected uncertainty into the meaning of the otherwise plain terms of the appellate waiver. Nor could he. A review of the plea colloquy establishes that the District Court properly questioned Castro and took affirmative steps to ensure that his plea was knowing and voluntary. Specifically, Castro testified that he had read the terms of the plea agreement, that he had discussed them with his attorney, that he agreed to all of the terms, and that he understood that the agreement limited his right to appeal. Castro's plea was thus knowing and voluntary with respect to the District Court's denial of the government's motion for a one-level reduction in Castro's offense level pursuant to § 3E1.1(b).

Cir. 2009) (holding enforcement of an appellate waiver would not constitute a miscarriage of justice despite defendant's claim that the government abused its discretion by not requesting an additional reduction in the district court's sentencing calculation); *United States v. Mabry*, 536 F.3d 231, 243 (3d Cir. 2008) (defendant's challenges to district court's sentencing calculation were "insubstantial and clearly encompassed by the broad waiver," and "[did] not implicate fundamental rights or constitutional principles").

Castro has failed to demonstrate that his appellate waiver does not encompass this claim or that he did not waive it knowingly and voluntarily, and he has not established that enforcement of the appellate waiver would result in a miscarriage of justice. We thus decline to exercise jurisdiction over his appeal with respect to the District Court's rejection of the government's motion for a downward departure under § 3E1.1(b).

C. *The Procedural and Substantive Reasonableness of Castro's 60-Month Sentence Under Count Nine*

Finally, Castro argues that, when it imposed a sentence that varied upwards by nearly 50 percent above the highest sentence recommended by the guidelines, the District Court produced a sentence that was procedurally and substantively unreasonable. According to Castro, the Court did not adequately explain why such a harsh sentence was necessary to achieve the legitimate aims of sentencing, considering all the aggravating and mitigating factors of the case, and the Court did not adequately account for Castro's lengthy record

of good works.[10]  In response, the government supports the sentence as well justified in light of numerous statements by the District Court explaining the reasons for the sentence given.  We agree that the sentence was well explained, but, given the flawed inclusion of Count Three in the sentencing calculus, the overall sentence must be reassessed.

Despite our well-known procedure for reviewing criminal sentences,[11] the District Court's upward variance is

---

[10] Castro's arguments in this regard are not foreclosed by his appellate waiver because the waiver contains an exception for "claims that … the sentencing judge, exercising the Court's discretion pursuant to *United States v. Booker*, 543 U.S. 220 (2005), imposed an unreasonable sentence above the final Sentencing Guideline range." (App. at 128.)

[11] Our review of a criminal sentence "proceeds in two stages." *United States v. Tomko*, 562 F.3d 558, 567 (3d Cir. 2009) (en banc).  First, we review the sentence for procedural error, "such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence – including an explanation for any deviation from the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51 (2007).  If there was procedural error, "our preferred course is to remand the case for re-sentencing, without going any further." *United States v. Merced*, 603 F.3d 203, 214 (3d Cir. 2010).  Second, if there was no procedural error, "we review for substantive reasonableness, and 'we will affirm [the sentence] unless no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court

unreviewable at this juncture, because, in calculating Castro's "combined offense level" for "multiple counts" using the method supplied by § 3D1.4 of the sentencing guidelines, the Court arrived at an offense level that was one level higher (20 instead of 19) than would have resulted if the conviction on Count Three had not been included. That in turn led to a guidelines range of 33 to 41 months instead of 30 to 37 months. "[G]iven the importance of a correct Guidelines calculation both to the sentencing process that district courts are required to conduct and to our ability to carry out reasonableness review, the use of an erroneous Guidelines range will typically require reversal under 18 U.S.C. § 3742(f)." *United States v. Langford*, 516 F.3d 205, 215 (3d Cir. 2008). Our reversal of Castro's conviction under Count Three accordingly necessitates a remand for resentencing solely for Castro's guilty plea on Count Nine. *See id.* at 211, 214 ("[A] correctly calculated Guidelines range will often be a necessary precondition of our reasonableness review. Where a district court begins with an erroneous range, it will be difficult for us to determine that it fulfilled its duty to consider the Guidelines and reason through to the ultimate sentence," because "the correct computation of the Guidelines range and any departures therefrom serves to clarify the basis for the sentence imposed and thus facilitates reasonableness review.").

We note with appreciation the District Court's thorough and thoughtful accounting of the aggravating and

provided.'" *United States v. Negroni*, 638 F.3d 434, 443 (3d Cir. 2011) (quoting *Tomko*, 562 F.3d at 568). At both stages we review for abuse of discretion. *United States v. Wise*, 515 F.3d 207, 217-18 (3d Cir. 2008).

mitigating circumstances in this case and its explanation for why it concluded that an upward variance was necessary to accomplish the legitimate aims of sentencing.[12] Despite that exemplary handling of the always difficult work of crafting and explaining an appropriate sentence, we must nevertheless remand for resentencing because we cannot conclude with confidence that, had the District Court operated from the

---

[12] For example, the Court specifically acknowledged much of Castro's good character, including that, "[w]ith perhaps one or two exceptions, I have never received as many letters attesting to a defendant's good character and urging leniency as I have in this case," which showed that, "[c]learly, he has the support and respect of many people in this community and elsewhere." (App. at 225.) The Court also recognized that Castro "has shown contrition for what he has done" and "is sincere in saying that he is sorry." (App. at 228.) Despite Castro's "many good works, particularly with children" (App. at 225), the Court expressed deep concern over Castro's willingness to use "force and violence." (App. at 227; *see also id.* ("I can't emphasize this enough, if force and violence had been used, someone could have been killed.").) But "most troubling" to the Court was that Castro was a police officer, and police officers "are held to a much higher standard." (App. at 230.) The Court felt "a compelling need to afford adequate deterrence to criminal conduct, particularly to deter others in law enforcement who may contemplate illegal conduct." (App. at 229.) After considering the mitigating and aggravating evidence, the Court found that the nature of Castro's conduct and the tremendous damage caused by that conduct outweighed the positive aspects of Castro's history and character, and called for a higher sentence.

34

correct guidelines range (30 to 37 months instead of 33 to 41 months), it would still have given a 60-month sentence. *See Langford*, 516 F.3d at 215 ("[T]he improper calculation of the Guidelines range can rarely be shown not to affect the sentence imposed." (internal quotation marks omitted)).

On remand, the District Court is "free to make its own reasonable application of the § 3553(a) factors" and ultimately may choose "to reject (after due consideration) the advice of the Guidelines" and impose the same sentence. *Kimbrough v. United States*, 552 U.S. 85, 113 (2007) (Scalia, J., concurring). But it must consider the correct guidelines range.

## III.    Conclusion

For the foregoing reasons, we will reverse Castro's conviction and 18-month sentence after trial on Count Three and remand to the District Court for entry of a judgment of acquittal on that count. We will also vacate Castro's 60-month sentence under Count Nine and remand to the District Court for resentencing on that count, using the correct guidelines range.