**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-3108
_____

UNITED STATES OF AMERICA

v.

KHALID FAHIDE CARTER,
                    Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
(D.C. No. 16-cr-00125-001)
District Judge: Hon. Christopher C. Conner
_____

Submitted under Third Circuit L.A.R. 34.1(a)
October 4, 2018
_____

Before: SHWARTZ, SCIRICA, and ROTH, Circuit Judges.

(Filed: November 2, 2018)

_____

OPINION[*]
_____

SHWARTZ, Circuit Judge.

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

Khalid Fahide Carter ("Carter") appeals his conviction for possession of a firearm in furtherance of drug trafficking and his sentence on drug charges. For the following reasons, we will affirm.

I

A

Carter was tried for drug and firearms offenses. During trial, the jury learned that Carter sold crack cocaine to a confidential informant ("CI") during a controlled buy set up by the Harrisburg Police Department. No officers testified to seeing a firearm on Carter during the transaction. After selling approximately one gram of crack cocaine,[1] Carter entered a van occupied by two women. Law enforcement stopped the van within ten seconds. One officer said that he observed "commotion going on in the back seat," App. 95, before Carter "very frantically exited the" van, App. 118, and ran. During the chase, Carter tossed a loaded semi-automatic pistol onto a nearby roof. Carter was quickly apprehended. Law enforcement searched Carter and found a cell phone, cash, and over five grams of crack cocaine. About ten-to-fifteen feet from where Carter was arrested, officers found a loaded firearm with a bullet in the chamber. According to one officer, Carter disclaimed any knowledge of the firearm and suggested that it belonged to the parents of one of the women in the van. Officers later determined that the firearm belonged to Carter's friend, Michael Pfautz. Inside the van, officers recovered Carter's Pennsylvania ID card, a digital scale, two magazines, and a holster that fit the firearm.

---

[1] An FBI Special Agent testified that a gram or less of crack cocaine sells for $20.00-$50.00.

2

Regarding the firearm, the women who were in the van testified that they did not see a firearm in the van at any time and they estimated that Carter was not in the van for long, stating that the officers arrived as soon as he got into the van. Pfautz testified that he owned the firearm. He said that he had accidentally left the firearm in its plastic case at Carter's house, but that he did not leave behind any ammunition or a holster. Pfautz testified that when he realized he left the firearm at Carter's house, he contacted Carter to alert him, but that Carter never contacted him about returning the firearm.

Carter testified in his defense. He admitted that he began selling crack cocaine in 2014, after he grew "tired of waiting for a [potential employer] to call [him] back," App. 224, and continued selling until his arrest in January 2016. He testified that he did not use crack cocaine but admitted selling crack to the CI and explained that during the sale, the van occupied by the women drove past him. He testified that he entered the van, which moved only ten-to-fifteen feet before it was stopped by law enforcement. Carter claimed that he then "reach[ed] down in the backseat, grabbed the handgun, placed it in my waistband, opened the door, . . . fled from the van," and then threw the firearm onto a nearby roof. App. 237.

Carter claimed that he possessed the firearm that day because he planned to return it to Pfautz and that he did not carry it during the drug transaction. However, he testified that he had not called Pfautz or made any other arrangements to return the firearm. To account for why the firearm was loaded, Carter testified that he took the firearm to a friend's house and the friend offered him a magazine and individual rounds and that Carter filled two magazines and placed one bullet in the chamber. Carter testified that he

3

did not know how to unload the magazines and so he intended to return the firearm with a round in the chamber, two loaded magazines, and one empty magazine, but not with the gun's plastic case, which he left at his house.

The jury found Carter guilty of distribution of cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and possession of a firearm in furtherance of a drug trafficking crime in violation 18 U.S.C. § 924(c)(1)(A).

B

The United States Probation Office prepared a Presentence Report ("PSR"), which calculated an offense level for the drug offense of 24 because the "offense involved at least 28 but less than 112 grams of crack cocaine" under U.S.S.G. § 2D1.1(a)(8), which, with a Criminal History Category III, resulted in a Guidelines range of 63-78 months. To calculate the drug quantity, the PSR relied on Carter's admission that he "distributed crack over a two-year period" and that "[c]onservatively, even if [Carter] only distributed one gram per week over the two-year period, the quantity is 110 grams of cocaine base." PSR ¶ 9. Carter objected to this calculation, arguing that while he may have admitted to drug trafficking for two years, there is no evidence as to the frequency or amount of drugs that he trafficked. In overruling Carter's objection, the District Court stated:

> After looking at the trial transcript in this case I conclude that the record amply supports the presentence report's estimate that the offense involved at least 28 but less than 112 grams of crack cocaine, and I say that is a conservative estimate. At trial the defendant admitted to dealing from 2014 to 2016. He also testified that he sold drugs to the confidential informant prior to the sale made on January 12, 2016.

> The defendant's own testimony, coupled with the amount of crack cocaine that was found on his person, 5.06 grams upon arrest, and the forty dollars worth of crack cocaine that he sold, approximately six grams, that same day, is sufficient to support the presentence report's estimate.
>
> The [C]ourt thus concludes that the drug weight equals at least 28 grams, but not more than 112 grams of crack cocaine, and I will overrule the defendant's objection . . . .

App. 339-40. The Court thus adopted the PSR's Guidelines calculation and findings, including that Carter had a history of intermittent employment. The Court then heard from the parties, including Carter, who noted that he had been incarcerated for "the whole 2014, so I don't know how I can be charged for like selling drugs from two years, from '16 to '14, because I was incarcerated for eleven months." App. 347. The Court imposed a total sentence of 123 months, which included a sixty-three-month sentence on his drug crime and a consecutive sixty-month sentence for his conviction for possession of a firearm in furtherance of drug trafficking.

Carter appeals.

## II[2]

### A

#### 1

We first review Carter's argument that there was insufficient evidence to support his conviction under 18 U.S.C. § 924(c)(1)(A) for possession of a firearm in furtherance of drug trafficking. Because Carter "did not preserve this issue for appeal by filing a

---

[2] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 3742(a).

timely motion for a judgment of acquittal, . . . we review the sufficiency of the evidence under a plain error standard." United States v. Gaydos, 108 F.3d 505, 509 (3d Cir. 1997). When reviewing the sufficiency of evidence to sustain a conviction, we examine the "totality of the evidence, both direct and circumstantial," and credit "all available inferences in favor of the [G]overnment." United States v. Sparrow, 371 F.3d 851, 852 (3d Cir. 2004) (citations omitted). "We have . . . evaluated claims of insufficiency of evidence in the plain error context and have explained that plain error warranting reversal exists when the insufficiency 'resulted in a fundamental miscarriage of justice.'" United States v. Castro, 704 F.3d 125, 137–38 (3d Cir. 2013) (quoting United States v. Barel, 939 F.2d 26, 37 (3d Cir. 1991)). "The prosecution's failure to prove an essential element of the charged offense does constitute plain error, and so can be understood as a miscarriage of justice." Id. at 138 (internal citations omitted). "It bears emphasis, however, that a manifest miscarriage of justice warranting reversal on plain error review occurs only where the record is devoid of evidence pointing to guilt—a stricter than usual standard."[3] Castro, 704 F.3d at 138 (internal citations and quotation marks omitted). Here, the record is replete with evidence establishing Carter's guilt.

2

---

[3] When the sufficiency challenge is preserved, we will "sustain the verdict unless it is clear that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Walker, 657 F.3d 160, 171 (3d Cir. 2011) (quoting United States v. Mercado, 610 F.3d 841, 845 (3d Cir. 2010)).

To prove a violation of § 924(c)(1)(A), the Government must prove: (1) the defendant committed a drug trafficking offense; (2) the defendant knowingly possessed a firearm; and (3) the defendant knowingly possessed the firearm in furtherance of a drug trafficking offense. United States v. Bobb, 471 F.3d 491, 496 (3d Cir. 2006). In determining whether the evidence was sufficient as to the third element, which is the only element Carter challenges, we examine

> the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found.

Sparrow, 371 F.3d at 853. Many of these factors support the jury's verdict.

Carter was apprehended: (1) immediately after he completed a drug deal, (2) while carrying proceeds from that sale and additional drugs, and (3) moments after he discarded a gun. Based on this conduct and the items he possessed when arrested, a rational jury could infer that he possessed the firearm to protect his drugs and cash. Carter argues that the absence of testimony that he was seen with a firearm during the drug deal itself precludes a finding of accessibility. However, the jury was allowed to draw inferences from the timing between the sale and his flight with a gun immediately after the sale and his testimony that he tossed the firearm before he was apprehended to conclude the firearm was accessible.

Moreover, given Pfautz's testimony that he did not leave any ammunition with the firearm or purchase a holster for it and that Carter obtained ammunition and loaded the gun at some point before the drug sale, the jury could have inferred that Carter had

7

intended to have the loaded gun available for his use during the sale. The jury was also free to discredit Carter's explanation that he had loaded the gun only out of curiosity and that he did not know how to unload it, particularly given his testimony that he knew how to load the gun.[4] A rational jury was also permitted to reject Carter's claim he intended to return the gun to Pfautz that day given that: (1) he initially told police that the firearm belonged to the parents of the women in the van and (2) at trial, he testified that the gun belonged to Pfautz, admitted that he made no arrangements to return the gun, and that he had items in the van for the gun that Pfautz did not own, like a holster and magazines, and that he did not have the gun's plastic case. The close proximity of the drug sale to the firearm, Carter's flight and his tossing the gun, his initial statement, and his weak claim that he planned to return the gun to Pfautz, together with the other items found, such as the magazines, holster, scale, and additional drugs provided a sufficient basis for the jury to find Carter possessed the firearm in furtherance of a drug trafficking crime. Thus, because the record has sufficient evidence to support the jury's conclusion, there is no error, plain or otherwise, in allowing the firearms conviction to stand.

## B

We next examine Carter's challenge to his drug sentence. "When reviewing the sentencing decisions of the district courts, we exercise plenary review over legal questions concerning the meaning of the sentencing guidelines, but apply the deferential

---

[4] While there is no direct evidence that Carter "affirmatively acquire[d] the firearm to promote his drug activities," Appellant's Br. 43, "our prior decisions have not required that every single factor must weigh in favor of conviction." Walker, 657 F.3d at 173.

clearly erroneous standard to factual determinations underlying their application."

United States v. Collado, 975 F.2d 985, 990 (3d Cir. 1992) (citations, quotations, and alterations omitted). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing body . . . is left with the definite and firm conviction that a mistake has been committed." United States v. Grier, 475 F.3d 556, 570 (3d Cir. 2007) (en banc) (internal citations, quotation marks, and alterations omitted).

Carter argues that the District Court clearly erred in finding that his drug trafficking offense involved at least 28 grams, but less than 112 grams of crack cocaine and awarding the resulting offense level of 24. The amount of drugs involved in the offense dictates the Sentencing Guidelines offense level. "[I]n calculating the amount of drugs involved in a particular operation, a degree of estimation is sometimes necessary," United States v. Paulino, 996 F.2d 1541, 1545 (3d Cir. 1993), and the Guidelines provide guidance for courts in making this estimation:

> Types and quantities of drugs not specified in the count of conviction may be considered in determining the offense level. See § 1B1.3(a)(2) (Relevant Conduct). Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination, the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, [and] similar transactions in controlled substance by the defendant . . . .

U.S.S.G. § 2D1.1, Application Note 5. "[T]he length of . . . drug [activity] together with other evidence may [also] provide a basis for a satisfactory estimate of the quantity of drugs involved." United States v. Reyes, 930 F.2d 310, 315 (3d Cir. 1991).

9

Here, the length of Carter's drug trafficking activities, the quantity of drugs he sold and with which he was arrested, and his reason for dealing drugs support the District Court's finding that he trafficked at least 28 grams of crack cocaine by a preponderance of the evidence. United States v. Gibbs, 190 F.3d 188, 203 (3d Cir. 1999). First, Carter was arrested after having sold approximately one gram of crack cocaine. Second, at the time of his arrest, Carter was in possession of another five grams of crack cocaine, which he was likely to distribute because he does not use crack cocaine. Third, Carter testified that he had been dealing drugs from 2014 until his arrest in 2016. Given that Carter had sold and was apprehended with a total of six grams of crack cocaine, the Court only needed to ascertain whether he sold at least twenty-two additional grams of crack cocaine in the fourteen months when he was not incarcerated, i.e., less than two grams per month,[5] to reach the minimum amount for the offense level it found applicable. Such an estimated amount is reasonable because Carter testified that he started selling drugs after he grew "tired of waiting for a [potential employer] to call [him] back." App. 224. This testimony, coupled with his history of intermittent employment, supports the inference that he relied on drug trafficking as his source of income. Because a gram or less of

---

[5] Carter argues that the District Court erred because it did not consider Carter's statement at sentencing that he was incarcerated for most of 2014. While Carter made this point after the Court ruled on the objection to the drug quantity calculation, nothing suggests the Court was unaware of this fact when made its drug quantity calculation. Moreover, omitting that time frame yields the same estimated drug quantity range. Thus, we are not "left with the definite and firm conviction that a mistake has been committed." Grier, 475 F.3d at 570.

crack cocaine sells for between $20 and $50, it is reasonable to infer that Carter sold more than one gram per month to support himself.[6]

Because the District Court's evidentiary basis for its drug quantity determination met the minimum standard of reliability required at sentencing, and because its findings were not clearly erroneous, we will affirm the judgment of the District Court.

III

For the foregoing reasons, we will affirm the District Court's judgment of conviction and sentence.

---

[6] Carter's comparison between his case and Reyes is misplaced. In Reyes, the district court relied on the length of the conspiracy and the testimony of a single prosecution witness to estimate the relevant drug quantity, but, as even the Government there had conceded, that witness's testimony "[could not] support the [district] court's finding" regarding drug quantity. 930 F.3d at 315. Unlike Reyes, the relevant testimony here is not from a prosecution witness, but the defendant himself, and no party has challenged the weight of his testimony concerning the duration of his drug dealing. Moreover, the District Court here had more than Carter's testimony: it had evidence regarding the quantity of drugs he sold and the amount he possessed when he was apprehended to corroborate its drug estimate.